MARSHALL MORGAN, *Admr. vs.* STATE OF RHODE ISLAND.

APRIL 9, 1943.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J.   This is a petition, under general laws 1938, chapter 135, § 7, to recover a bank deposit from the general treasurer of the state. From a decree of the superior court granting the petition, the state has appealed to this court.

The deposit in question was originally opened in the Savings Bank of Newport in the following manner: On January 19, 1833 there was deposited in the names of George Weaver and Rebecca Weaver the sum of $40. No other deposits were made in this account, and, until October 22, 1839, there were no withdrawals. On that date the deposit, which had increased by reason of accumulations of interest to $54.76, was closed out. Rebecca Weaver received $27 and the balance of $27.76 was transferred to a new account which was immediately opened in the name of George Weaver and which is the account involved here. No additional deposits were ever made in this account and there were never any withdrawals therefrom. On June 17, 1910, when it was paid over to the general treasurer, it had grown to $961.82.

The bank has no record of the signature of either of these depositors and no information of any kind that would be of assistance in identifying George Weaver or Rebecca Weaver. The books of account of the bank are in evidence but they do not appear to contain any information that would identify these depositors. If any receipt or bankbook was ever issued to George and Rebecca Weaver or to George Weaver alone none has been found and the bank has no record of having issued any. On this state of facts the petitioner was forced to resort almost wholly to circumstantial evidence in order to prove his title to the deposit.

The petitioner is administrator *d.b.n.* of the estate of a George Weaver, who died at Newport on April 4, 1884. This estate was at that time represented to the probate court of Newport as insolvent, and on March 30, 1885 the commissioner's report thereon was accepted. Petitioner was appointed administrator *d.b.n.* on January 13, 1941 on the petition of Mrs. Alice Smith Arnold, a grandniece of the intestate. His appointment was obtained for the purpose of claiming the bank deposit in question. Mrs. Arnold had been previously informed by the petitioner that he had been investigating the Weaver family and that from his research he was convinced that her granduncle George Weaver was the person who had opened an account with Rebecca Weaver, on January 19, 1833, and was also the person in whose name the new account was opened on October 22, 1839. After his appointment as administrator he filed his petition in the superior court for payment of such account to him, but the state opposed his claim on the ground that his intestate was not the George Weaver who had opened the account.

The theory by which the petitioner attempted to prove his claim in the superior court was briefly this: He contended that George Weaver and Rebecca Weaver were third cousins by descent from a common ancestor Thomas Weaver; that they were not only thus related by blood but also that there was a bond of affection between them which led them, on January 19, 1833, to make the first deposit, probably, in the opinion of the petitioner, in contemplation of their marriage and the setting up of a home of their own. The petitioner further claimed that on October 22, 1839, it having turned out that Rebecca had chosen another, Edward Almy, to be her future husband, the joint account was closed and George Weaver allowed his share to remain on deposit at the bank. Petitioner also argued that this part of his thory was supported by the fact that Rebecca named her third child George Weaver Almy, that is, according to petitioner, after his intestate. He argued that his theory was further borne out by

an inquiry made of a bank in Newport, by George Weaver's sister, Joanna Weaver Gifford, concerning a bank account belonging to her brother.

Petitioner established his theory to the satisfaction of the justice of the superior court on the following evidence: First he introduced the records of the bank with pages properly identified showing the history of the deposit in question and also the original joint deposit. Next he introduced three witnesses, Lucy M. Weaver, the wife of intestate's grandnephew Frank W. Weaver, Annie E. Adams and Lucy S. Arnold, grandnieces of the intestate, who testified as to the identity and relationship of certain persons in the Weaver family and especially their own relationship to the intestate. Petitioner then testified as a genealogist concerning the intestate's descent from a Job Weaver whose name appeared in the federal census of 1790 for the town of Middletown. He introduced a number of exhibits such as death, marriage and military records or certificates and copies of federal censuses from which he made deductions. He also frequently referred in his testimony to a published history of a Weaver family by Lucius Weaver which, however, did not include his intestate or intestate's father. This history, however, was not offered by the petitioner as an exhibit.

There was no direct evidence that George Weaver, petitioner's intestate, and Rebecca Weaver ever opened the original account on January 19, 1833 or that they even knew each other. Petitioner deduced that they must have been acquainted because of a blood relationship which petitioner assumed must have existed between them. There was no direct pedigree evidence that they were so related. Petitioner deduced such relationship from the similarity of certain names in the pedigree of Rebecca and of his intestate. He was permitted to give such opinion testimony as a genealogist. In making such deduction he relied upon the Weaver family history by Lucius Weaver. This history shows, according to his testimony, that Rebecca Weaver was descended from Clement Weaver who came to the Island of Rhode

Island from Glastonbury, England, and that he had a son
Clement who had a son Thomas who was Rebecca's great
grandfather; that Thomas had a son Job who was born in
Middletown, Rhode Island, in 1754; and that this Job
Weaver married and had two children, Clark and Mercy
Weaver.  Petitioner testified that this Job Weaver was
George Weaver's grandfather, not through Clark Weaver
but through another son of Job Weaver also named Job, al-
though he admitted that the family history does not show
any second Job Weaver.

The petitioner testified that George Weaver was born in
1807 of Job and Sarah Weaver and that Job was probably
the son of Job Weaver who appears in the Weaver family
history.  According to the history, however, he had two sons
who were unnamed and probably died at childbirth, and
there was only one son named Clark.  The petitioner also
testified that in his opinion the Weaver family historian was
in error in that respect and that one of those unnamed sons
grew to manhood and was Job Weaver, the father of his
intestate.  Petitioner based this opinion on the federal cen-
sus of 1790, which showed a Job Weaver in Middletown as
the head of a family of one male sixteen years of age or over
and three males under sixteen.  One of these males under
sixteen, petitioner testified, was Job Weaver, the father of
his intestate, but he admitted on cross-examination that this
was slightly conjectural on his part.

To support this conjecture, however, petitioner testified
that he had interviewed one John Oman Brightman of New-
port, a descendant of Mercy Weaver, who was a daughter of
the Job Weaver in the family history, and found that he had
a photograph of George Weaver, which resembled one that
was in the possession of his grandniece Mrs. Alice S. Arnold
and is in evidence as an exhibit. He further testified that
Brightman knew something of George Weaver and his fam-
ily, but "not very much, away back", and that "it seems that
there is some close relationship or he wouldn't have a picture
of George, he wouldn't know who George was." He admitted,

however, that, even with this evidence, what was the relationship is "something conjectural". The picture which Brightman had was not offered in evidence nor was Brightman produced as a witness.

If these assumptions and deductions of the petitioner are to be considered evidence tending to prove that Job Weaver, the father of George Weaver, was of the line of Job Weaver recorded in the family history, they are certainly very weak. They are subject not only to the infirmity that they come from a witness with an interest, but also to the fact that they are admittedly the result of pyramiding inferences on facts that are, if at all relevant, only remotely so. We are, therefore, of the opinion that the petitioner clearly failed to prove that his intestate was related to Rebecca Weaver through Thomas Weaver as their common ancestor.

Aside from this claim of relationship, the petitioner made the further claim that his intestate had an attachment of affection with Rebecca and that the original deposit of $40 represented their joint savings in contemplation of a future marriage. The evidence upon which this claim is sought to be established is even more unsubstantial than his evidence of relationship. It is nothing more than a whole series of surmises. Indeed, there is not a shred of evidence from any witness or any document that there was, at the time of the first deposit in 1833 or later, any engagement or romantic attachment between this intestate, then a man of twenty-six, and Rebecca, then a young girl of fifteen, or that they even had a speaking acquaintance with each other. Nevertheless, petitioner testified that proof of such a relationship could be found in the fact that Rebecca named her third child George Weaver Almy. The facts in evidence as to the family of Rebecca clearly and completely, in our opinion, dispose of such an extreme assumption.

Rebecca had a younger brother George Briggs Weaver, and a sister Mary Weaver. Her first child was named Edward, which was the name of her husband. Her second child was named Mary, which was the name of one of her sisters.

Her third child was named George Weaver, not improbably after her brother, rather than after a rejected suitor. But the petitioner argues against this latter inference because the full name of Rebecca's brother was George Briggs Weaver and not George Weaver. This argument lacks merit, as his middle name was merely his mother's family name. It would be quite natural for Rebecca and Edward Almy, in naming their son after his uncle, to drop the uncle's middle name so that their son's middle name would also be that of his mother, namely, Weaver.

Moreover there is another fact in evidence which lends credence to the probability that Rebecca was honoring her own brother rather than a stranger. Apparently after George Weaver Almy was born, a daughter was born to Rebecca's brother George and he named her Rebecca Frances Weaver, evidently in honor of his sister and also his wife, whose maiden name was Abbie Frances Peckham. Certainly, if any consideration is to be given a rule of probabilities it is unlikely that Rebecca had any other George Weaver than her brother in mind when she named her second son. Indeed, petitioner has offered no evidence that tends to support the deduction which he had made that she named this son after his intestate.

What remains then of the petitioner's theory? In our opinion there is nothing except certain suppositions, conjectures or surmises which arise wholly from opinion evidence that he was allowed to introduce and which the trial justice considered in announcing his decision.

The first of these is the supposed improbability that on January 19, 1833, Rebecca then a girl of fifteen and her brother George, then a boy of twelve, would have had $40, which was a large sum in those days, and would have opened a bank account of their own. This is a bare supposition without any evidence in the record concerning their own or their family's circumstances to support it; but if there is any merit in it we think it is greatly weakened, if not wholly dissipated, by reasonable inferences which may

be drawn from other transactions on that day at the bank as shown by the bank's records which are in evidence.

On page 240 of ledger B of the bank records appears the deposit of $40 received on January 19, 1833 from George and Rebecca Weaver. On that same ledger page the following entries of that date also appear. Mary Weaver opened an account in the sum of $200. Catharine Weaver opened an account in the sum of $200, which was transferred on January 10, 1834, to Hannah B. Weaver. On page 58 of this ledger is an account opened May 17, 1828 in the names of Mary and Catharine Weaver for $50 and withdrawn January 19, 1833. There also appears on page 190 of this ledger an account in the name of Mary Briggs, which was closed on January 19, 1833 by a withdrawal of $427.47. Did this withdrawal have any connection with these new accounts and were these new depositors of the same Weaver family as Rebecca and George? We do not definitely know; but, in the absence of contradictory evidence, it could be argued that there was probably a connection of some kind between the deposits and withdrawals and that these depositors were members of the same family.

It is significant that the total of the amounts deposited in the Weaver accounts is $440 and that the amount withdrawn from the Briggs account almost equals that figure. It is also significant that Hannah B. Weaver is the name of the mother of George and Rebecca and that her own family name was Briggs. A further significant fact is that Hannah B. Weaver had a daughter named Mary and another named Catharine and that each of them was a minor on January 19, 1833. Was the Hannah B. Weaver in these records the mother of George and Rebecca? It may be argued that she was. And it may also be argued that Mary Weaver and Catharine Weaver who opened these accounts were the sisters of George and Rebecca. Moreover, it would not be improbable that Mary Briggs was their blood relative, possibly their maternal aunt.

It is not necessary, however, for our present purposes to

make such assumptions or definitely draw such inferences. It is sufficient to suggest them in order to show how weak and unsubstantial is any assumption or inference, on the present record, that Rebecca and George were not likely to have $40 of their own with which to open a savings account.

The second supposition is that there was a probability that this account of $40 belonged to the petitioner's intestate because of some testimony to the effect that the intestate's sister, Joanna Weaver Gifford, had made an inquiry of a bank in Newport about an account in her brother's name, and also because of some further testimony of a conversation between two other relatives of the intestate in which the account was referred to. The gist of that conversation, as testified to by the witness, was that, if Joanna Weaver Gifford had obtained George's bank account, she could have repaid Annie Hart for taking care of her in her last illness. Annie Hart was a niece of the intestate. She had apparently taken care of his sister Joanna before her death. The person who made the remark was Mrs. Samuel Weaver referred to by the witness, who was her daughter-in-law, as "Mother Weaver". Her husband, Samuel Weaver, was a nephew of the intestate.

This testimony was admitted for what it was worth over the state's objection. The state excepted to these rulings and has included them in its reasons of appeal. However, we need not pass on their correctness, as the testimony is clearly without evidentiary value. It is so vague and uncertain and so lacking in relevancy to the particular account here, and specifically to the Savings Bank of Newport, that it is without probative value on the issue of petitioner's claim of ownership by his intestate of the account in question.

We have thus reviewed the evidence at greater length than is usual because we find ourselves unable to approve the findings thereon by the trial justice. Assuming, without deciding, that the burden on the petitioner in a pro-

ceeding of this kind was to prove his title by a fair preponderance of the evidence, we are clearly of the opinion that he failed to sustain such burden.

In coming to this conclusion, we have given great weight to the rule that it was incumbent upon the petitioner to prove his title by the strength of his own evidence and not by the weakness of his adversary's evidence. The importance of this rule is well illustrated by the facts of the following cases in which the question of identity was involved. Great caution should be exercised in weighing and sifting the evidence offered to prove such identity. As the court well remarked in one of those cases: "There are few more difficult subjects with which the administration of justice has to deal. . . . In the present case we have all those difficulties multiplied a hundred fold by the bias of interest under which even honest people so easily persuade themselves that they are the rightful heirs to a vacant fortune." *Bryant's Appeal*, 176 Pa. 309, 318. *In re Matter of Wood* (N.Y. Surrogate) 164 Misc. 425; *In re Matter of Hayden* (N.Y. Surrogate) 176 Misc. 1078; *Watterson* v. *Tremaine*, 24 N. Y. S. (2d) 830.

In our opinion, the petitioner's evidence, including that to which the state objected below and has pressed its objection here, falls far short of meeting the requirements of the preponderance rule. We are, therefore, of the opinion that he has failed to prove that his intestate was the George Weaver who opened the account in question, and that the justice of the superior court was clearly wrong in finding that he was.

The respondent's appeal is sustained, the decree appealed from is reversed, and the cause is remanded to the superior court with instructions to enter its decree denying and dismissing petitioner's petition.

*Marshall Morgan, Alfred J. Curry*, for petitioner.

*John H. Nolan*, Attorney General, *John E. Mullen*, Assistant Attorney General, for respondent.