Estate of Charles Bryant, deceased. Appeal of George E. Bryant et al., Claimants.

*Evidence—Identity of person—Certificate of citizenship.*

Identity is one of the most difficult questions with which the administration of justice has to deal, and whether the witnesses have seen the party in question or not, their testimony as to recognition or identification is one of the least reliable facts; therefore in a case of the disputed identity of a deceased sailor whose long absence has rendered actual and undoubted identification impossible, his certificate of citizenship, found among his papers, should have controlling weight. It is his charter of safety and protection, likely to be scrupulously taken out and carefully preserved. It is the property and act of the man himself who knows the truth, and it amounts to his own identity. To discredit it would be to attribute falsehood and perjury to the person without evidence.

*Evidence—Identity of person—Photographs.*

Where claimants to an estate of a person whose identity is in dispute introduce in evidence a photograph of their kinsman, whose identity with the deceased they are attempting to establish by a comparison of the photograph offered and two photographs found in the trunk of the deceased, and where the comparison shows a marked resemblance, it is strong evidence that they are photographs of the same person; especially when the kinsman of claimants had the same name, same age, same birthplace and same occupation as the deceased.

*Evidence—Inferences—Probabilities.*

Where the evidence of the claim of alleged heirs to the estate of an alleged ancestor showed that the kinsman of claimants was born in a suburb of London; that he ran away and became a sailor about the year 1835; that he was then about sixteen years old, and that he had not been heard of afterwards; and where the testimony to show that he was the same person as the deceased rests upon the uncorroborated testimony of one person to an alleged conversation in which the decedent was represented to have said that he was born in said suburb of London and came to this country when a boy as a sailor, with other particulars as to his brothers, sisters, etc.; and where this alleged declaration is at variance with all the acts, declarations and affidavits of decedent at previous times, and is discredited by the contradictions of witness, his interest in the claim, and his declarations to other parties; and also where the decedent left among his effects a certificate of citizenship which stated his birthplace as an inland town in Massachusetts, in which place there had actually existed a man of the same name, the same age, the same vocation and the same personal appearance, it was *held*, that the claim could not be sustained.

*Services—Search for heirs.*

A claim for services and expenses in looking up the relatives of a decedent who had died without known heirs, rendered by one not employed by the administrator, of his own motion, in preparing a case for claimants, will not be allowed.

Argued March 30, 1896.   Appeal, No. 12, July T., 1895, by George E. Bryant, Henry L. Bryant, Abbey E. Taylor, William E. Bryant, Jennie Bryant White, Charles E. Bryant, Frederick W. Bryant, Carrie D. Matson, Frank E. Bryant, Anna Bryant, Hiram E. Bryant and Adeline F. Bussinger, claimants to the estate of Charles Bryant, deceased, from decree O. C. Phila. Co., July T., 1894, No. 182, awarding estate to Ann Chance and others, English claimants.   Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

The facts sufficiently appear by the adjudication of the court below, ASHMAN, J., which is in part as follows:

Charles Bryant died at the age of seventy years, on July 26, 1893, at the Delaware House, a hotel at the corner of Second and Pine streets, where he had lived for nine years.   Dating as far back as 1846, his home appears to have been in Philadelphia.   He was married here on June 7, 1853, and his place of residence from that time until his death was distinctly shown to have been within the city limits.   He had followed the sea

from an early age, and had risen from the grade of an ordinary seaman to that of captain and owner of a brig. In 1870 he appears to have abandoned the sea. In that year he opened a grocery store at Third and Carpenter streets, and he retired from business a few years afterwards, with an estate, part of which probably came to him from his wife, which at his death was valued at about $45,000. He was at all times reticent as to matters relating to his personal history; his brother-in-law declaring that in an intercourse of forty years he had never known the decedent to allude to his parents or other kindred. He had no correspondence and no communication with any who claimed to be of his blood, and he left no writing of any kind except a United States certificate as sailing master, to be noticed hereafter, which could furnish the slighest clue to his origin. He died suddenly of apoplexy. Letters of administration on his estate were issued to James T. Thompson, the proprietor of the hotel, and a creditor to a small amount of the decedent, and that gentleman immediately notified the commonwealth's officers that an escheat had occurred. Various inquiries were set on foot and notices were published, and the details of the case gained considerable notoriety through the newspapers here and elsewhere. The result was that at the audit of the administrator's account, in addition to the commonwealth, five different sets of claimants appeared, each of which set up title to the estate, as the sole surviving next of kin of the intestate. These sets or classes of claimants hailed respectively from Maine, Massachusetts, New York and Illinois, and the members of one of them jointly from Nova Scotia and England. Their narratives, dissimilar in everything else, had this feature in common —that the relative, whom they described as identical with the decedent, had disappeared from their midst more than a generation ago, had sent them no message, oral or written, and, except in two instances, had never again been seen by them or their witnesses. One means of identity, however, was left open. Among the few personal effects of the decedent were a daguerreotype and a photograph which were evidently of old date, and portrayed him at what seemed to be the age of thirty years or thereabouts. These pictures were recognized in the most positive terms by the representatives of each set of claimants as the undoubted likeness of their individual decedent. It is easy to

see that this diversity of belief as to the original of the portrait took away from the individual opinions every vestige of value which they might otherwise possess as a matter of evidence. Admitting, what it requires a large gift of credulity to admit, that five persons of the same age and name, but wholly unrelated to each other, disappeared at the same time from five different places and were thereafter lost to all former acquaintances, and that these five persons so closely resembled each other that a single portrait would serve for the entire group, the difficulty would still remain of assigning, out of so many originals, his own proper personality to this decedent of adaptable likeness, who is proved to have been an exact copy of them all.    The embarrassment is not helped by another circumstance: The Massachusetts claimants produced a photograph of the relative whose identity with the decedent they sought to establish, and they contended that this picture was a counterpart of those which were admittedly portraits of the decedent; but the remaining claimants were unanimous in denying that any similarity whatever existed.    It was forcibly said by PAXSON, C. J., in a case where testimony of a like character had been submitted : " Granting the likeness, it may be the result of the merest chance.  We all know that striking likenesses often occur between persons who are not of the same blood; so strong that in many instances the one is mistaken for the other."    Sheehan's Estate, 27 W. N. C. 534.    To accept it, even if uncontradicted, as conclusive, would be to build the decision upon what is, in the most literal sense, a shadow.

Another feature which the several claimants had in common was that each of the absent relatives had disappeared without any assignable cause for his leaving.    One of them had vanished in infancy, but in the case of each of the others, his home intercourse had been pleasant and his final departure had been in the course of his ordinary calling; yet he had never thereafter addressed a line to his former associates, and had dropped out of their lives as completely as he would have done if he had removed to one of the fixed stars.    If the narratives told by the witnesses are reliable, and in the main they may be true, the decedent must be regarded as the type of quite a number of Charles Bryants, each of whom is possibly living a dual life, and, without having developed any preparatory wickedness, has cast off the ties which were generally held to be sacred.

The Massachusetts claimants were nephews and nieces and remoter collateral kindred of one Charles Bryant, who was born July 25, 1822, in the town of North Bridgewater, now Brockton, in that state. He was a sailor, and in 1848 left in a coasting vessel on his last known voyage. He never returned, and the rumor was that he died that year in New Orleans. In 1848 a letter was received by one of the family announcing the sailor's death either on the trip or in a southern city, and about the same time a box purporting to contain his clothing also arrived. No further tidings ever came to hand, and the death had been universally accepted as a fact for more than forty years, and until intelligence of the death of the present decedent. The latter fact was communicated to the claimants by an agent who was sent by the administrator on an errand of inquiry to Brocton. A certificate had been found in a trunk belonging to the decedent, under the hand and seal of the collector of the port of Philadelphia, dated May 2, 1856, which set out that Charles Bryant, an American seaman, aged thirty-three years, five feet eight and one half inches in height, of light complexion, brown hair and gray eyes, with a scar on the left hand, and born in North Bridgewater, Massachusetts, had produced satisfactory proof that he was an American citizen. The anomaly may just here be noted, that although this paper accurately described him in other particulars, it failed in this : that the decedent unquestionably had black hair and eyes, and a dark complexion, and was never known to have had a mark upon either hand. The claimants were able to identify the features of Charles Bryant, of Bridgewater, in the likenesses which were shown them of the decedent; and their description of the former person correspond in a general way with that of the decedent himself, except as to the eyes, hair and complexion, in which their original answered to the recital in the certificate. The evidence upon this point was either traditional or hearsay, because none who appeared at the hearing had ever seen their kinsman. The coincidences which obtained in this case, striking as they were in respect of name, age and place of origin, cannot, however, be accepted as decisive. We have already seen that they were not aided by the alleged resemblance of the picture of the missing man to the portraits of the decedent, for the reason that a likeness, equally strong, was claimed with as great positiveness

for three other men who had disappeared. The fact also that the certificate named North Bridgewater as the place of decedent's birth, must be taken in connection with the decedent's own statement which will be presently alluded to, that he came from Massachusetts. To preserve the verisimilitude, he would, assuming that the certificate in question was really used by him as his own, be very apt to select for his putative birthplace the town of North Bridgewater, a place which was prolific of Bryants, as the slightest inspection of Kingman's history of the locality will demonstrate. Against these coincidences must be placed the well founded tradition, which the receipt of the letter and box raised into something more than a rumor, of the death of Charles Bryant of Bridgewater, in 1848, at New Orleans. Here, again, a most important incident comes into play. The claimants, it would seem, had never thought it worth while to verify the truth of the report of their kinsman's death by personal inquiry at the place where it was supposed to have happened. The agent employed by the accountant, however, himself visited New Orleans for that purpose, and as the result of his investigation he produced at the hearing a transcript, duly authenticated, from the records of the board of health of New Orleans, reciting that " C. Bryant, a seaman, a native of Massachusetts, aged 26 years, died on the first day of May, 1848, at the Franklin Infirmary," in that city. This proof tallied so nicely with that which was furnished by the memorials of the death which had come at the same time and from the same place, that no after-coincidences, no matter how plausible, could sweep it aside; and, the auditing judge thinks, it effectually disposed of the claim. . . .

The English claimants were brought to light through a clue which had been furnished by the decedent himself. In 1888 a will was prepared for him by the agent who attended to his real estate interests, by which he left one third of his property to the children of a deceased stepson, and the balance to charities. A few months before his death he declared that he had destroyed this will, and the agent then sought to impress upon him the duty of providing for his own kindred, and interrogated him very seriously as to his family connections. He parried these inquiries by saying that he had no knowledge that a single relative survived, and that he had no desire to search for those

who, if they were found, would care only for his money. He was finally induced to say he was born in the district of Poplar, in London, of Irish parents; that his father was a ropemaker; that he himself when a boy had come over to this country as a sailor; that he left four brothers and four sisters behind him, of whom one sister, he remembered, had been very kind to him. He gave the names of these persons, and he also declared that the child of a brother or sister lived somewhere in Nova Scotia. He admitted that he had always concealed the place of his birth, and had avowed himself a native of Massachusetts. Beyond these meager details he either could not or would not go. After his death, the agent inserted a notice in a newspaper published in Halifax, N. S., calling in general terms for information as to any surviving kin of the decedent. As a result of that notice he received a letter from a person signing himself Charles Bryant, who alleged that he was a son of Cornelius Bryant, a brother, and who gave the address of his sister in Chatham, England. This lady was visited by the agent in person, and the story which she told corresponded in every detail with that which had come from the lips of the decedent and the nephew in Halifax. These particulars embraced the nativity and names of his parents; the trade of his father; the names of the various members of the family, and the date and manner of the decedent's abrupt departure from home. It was ascertained that the informant, Mary Ann Fariess, was the sole survivor of the brothers and sisters, and that most of the children, to the number of twenty-two, of those who had died were still living in London. These were in turn seen by the agent, and they severally corroborated the statements of the sister. The sister and a niece, daughter of James, a deceased brother, appeared at the audit, and testified among other matters that the deceased was born in 1819, and was baptized at King's X Chapel, London, 1819 or 1820, and had run away at sixteen years of age, and shipped on the ship Thames, and that no further tidings of his whereabouts had ever been received. This testimony can afford to stand without comment. It is the highest class of evidence which is known to the law; it was furnished by different parties, widely separated from each other, and between whom no possibility of collusion could exist; it bore out exactly the statements of the decedent, and it tallied with all the known inci-

dents of his life.  To the mind of the auditing judge it is so entirely convincing that he has contented himself with giving it only in outline; especially as a sense of justice to rival claimants, whose demands were pressed under an honest belief that they were genuine, required that some space should be given to the discussion of their merits.  It was urged against the claim that it rested, like its immediate predecessor, upon the testimony of a single witness, a proposition which the auditing judge concedes.  He also admits as conceivable that a person who had secured from a claimant representing himself to be the heir of a decedent the names and degrees of relationship of those who would be entitled, if they were the rightful heirs, might be base enough to pretend that he had received those details from the decedent in his lifetime.  In that way he would apparently give to a title which was wholly fictitious the direct sanction of the decedent.  But that no such fraud was perpetrated here is self evident.  If the agent who finally brought the English claimants into the case was not told by the decedent that probably a relative was still alive in Nova Scotia, why did he advertise in the Halifax papers?  The decedent had certainly told others that he was born in Massachusetts, and the administrator promptly and properly sent a messenger to that state, in quest of living kindred.  The advertisement in question was inserted almost immediately after the death, before the circumstance of the case had gained publicity, and before any claimant had had time to apply.  The auditing judge thinks the claim was effectually proved, and he so decrees accordingly.

A word remains to be said respecting the United States certificate in the name of Charles Bryant.  Beyond the circumstance that it was produced from among the effects of the decedent, nothing was known as to its use by him, or whether he used it at all.  In the very material points by which it was meant to identify the bearer, the color of the hair and eyes and complexion, it was certainly at fault.  Its description was of a man of brown hair, gray eyes and a light complexion, while the decedent was almost unanimously accredited with black hair and eyes, and a dark complexion.  The witnesses on behalf of the Bridgewater, Mass., claimants picture their decedent as possessing, in 1848, the characteristics of color set out in the certificate, and in so doing they described another person than the

present decedent.  According to the testimony of some of the witnesses for Mrs. Dean, it is a custom among seafaring men to give to custom house officials false answers to name and nationality, where some temporary or local advantage can be secured by perjury.  If the decedent did this, and thereby obtained a certificate that he was an American citizen, born in Massachusetts (the fact being otherwise) it is, nevertheless, difficult to see how he could have misled the official in a matter so open to the senses as the color of his hair and the tint of his complexion.  If we wander into conjecture we may guess that the official was color blind.  The paper, at best, must play a very subordinate part as evidence.  Its chief interest is that it assigns North Bridgewater as the decedent's birthplace.  But he named other places as well.  He said to one witness that he came from Maine, to another that he came originally in a man-of-war to Boston, and two witnesses, one of whom was his stepson, believed him to be an Englishman or an Irishman.

A claim on behalf of Henry H. Colclaser for $300, and another by George Lodge for $963, were presented.  Both were of the same character, and were based upon services of the claimants, in looking up the relatives of the decedent.  The services required a high order of intelligence, and they involved considerable travel, and a large expenditure of money, and they undoubtedly resulted in securing the evidence upon which a distribution of the estate can be decreed.  The claims are allowed.

The appellants are known as the Massachusetts claimants.

The exceptions to the findings and conclusions of the auditing judge were dismissed by the court in banc: HANNA, P. J., 4 Dist. Rep. 192.

*Errors assigned* were, (10) awarding to English claimants; (9) refusal to award to appellants; (8) award to George Lodge.

*Samuel W. Cooper* and *John G. Johnson*, for appellant.—As to photograph: Udderzook v. Com., 76 Pa. 340; R. v. Tolson, 4 Foot Fin. 103.

Where the facts found are merely deductions from other facts the conclusions of the auditing judge are simply the result of

reasoning and are not conclusive in this court: Phillips' Appeal, 68 Pa. 138; Hindman's Appeal, 85 Pa. 470; Cake's Appeal, 110 Pa. 65; Fessenden's Est., 170 Pa. 641; Moyer's Appeal, 77 Pa. 482; Milligan's Appeal, 97 Pa. 525; Sweatman's Appeal, 150 Pa. 369; Kittel's Est., 156 Pa. 445; Brotherton v. Reynolds, 164 Pa. 134.

As to similarity of names, etc., on questions of identity: Fulkerson v. Holmes, 117 U. S. 389; Russell v. Smith, 9 M. & W. 810; McConeghy v. Kirk, 68 Pa. 203; Simpson v. Dinsmore, 9 M. & W. 47; Smith v. Henderson, 9 M. & W. 798; Sitler v. Gehr, 105 Pa. 577; Atty. Gen. v. Kohler, 9 House of Lords, 653; Breiden v. Paff, 12 S. & R. 430; Kelley v. Volney, 5 Penn. L. J. Rep. 300; Wharton on Evidence, 3d ed. sec. 1277; R. v. Inhabitants of Harborne, 2 A. & E. 540.

*William W. Ker*, for appellee.

OPINION BY MR. JUSTICE MITCHELL, July 15, 1896:

Charles Bryant died intestate, in July, 1893, aged about seventy. He had been married but his wife and only child were dead, and he was without known relatives. He was a seafaring man, but had made his home in Philadelphia for forty odd years, had left the sea for twenty-five years, and during most of that time had been in the grocery business, but was well known in nautical circles as Captain Bryant. The parties to the present litigation are claimants of his estate, and their claims depend upon the question of identity.

There are few more difficult subjects with which the administration of justice has to deal. The carelessness or superficiality of observers, the rarity of powers of graphic description, and the different force with which peculiarities of form or color or expression strike different persons, make recognition or identification one of the least reliable of facts testified to even by actual witnesses who have seen the parties in question; and where they have not, there is the added obstacle of the inadequacy of language to describe the minute variations of feature and color which go to make up the individual personality. In the present case we have all these difficulties multiplied a hundred fold by the bias of interest under which even honest people so easily persuade themselves that they are the rightful heirs to a vacant fortune.

Five sets of heirs or next of kin appeared before the orphans' court, and in addition the commonwealth, who claimed an escheat on the ground that none of the others had proved relationship.  The court below awarded the estate to the appellees, one set of claimants dropped out, and the other four, including the commonwealth, are now before us.  The appeals are separate, but it will be more convenient to treat them all in one opinion.

The claims of Daniel Bryant et al., known as the Illinois claimants, and of Susan Dean, are effectually disposed of by the opinion of the auditing judge in the court below, and do not need any further discussion.  The other claims depend not so much on the findings of fact by the court below, as upon the proper inferences from the facts proved, and therefore require a consideration of the evidence.

When Bryant died there were found in his trunk a certificate of citizenship given by the collector of the port of Philadelphia, a daguerreotype and a card photograph of himself, and at the hearing there were produced three affidavits made by him as part owner and master of a vessel.  The learned auditing judge was impressed apparently by some testimony that it is customary "among seafaring men to give custom house officials false answers as to name and nationality where some temporary or local advantage can be secured by perjury," and he finds that the certificate "at best must play a very subordinate part as evidence."  From this view we are obliged to differ totally.  The papers, especially the certificate, are the only safe foundation for the whole case.  Everything else is more or less dependent on conjecture and inference, but these are the property and the acts of the man whose identity is in issue.  He at least knew the truth, and these are his own testimony to his own identity.  To attribute falsehood and perjury to him without evidence, without motive shown, against the legal presumption of innocence, and against the weight of a good character borne for forty years in the community where he lived, is monstrous injustice, and pretended relatives who come here basing claims to his property on such charges violate not only the rules of legal reason but of common decency.  We regard this fundamental proposition as the first step in the investigation, that no claim can be sustained which is inconsistent with these papers, unless it gives a full, adequate and convincing explanation of the discrepancies.

This consideration alone would make an end of the case for the appellees. Their claim rests on the allegation that the deceased was an Englishman, born in a suburb of London in 1819, who ran away and became a sailor at the age of sixteen, and had not since been heard of. This story charges Captain Bryant with falsehood and perjury as to both age and nationality and instead of being convincing is full of insuperable difficulties. Without recounting them in detail it is sufficient to note that it asks us to believe that a British sailor who had left his native country more than twenty years before, and had had a settled residence in Philadelphia for ten years, desiring to have a certificate of citizenship, instead of getting naturalized, preferred to commit perjury, and in so doing not only selected as his pretended birth place an inland town of Massachusetts, but hit upon one in which there had been actually existing a man of the same name, the same age, the same sea faring vocation, and whose personal appearance so closely resembled his own that whatever weight his photograph might have as affirmative evidence of identity no one looking at it could say with confidence that it was not the same man. The draft upon credulity is too great.

But even if the story were intrinsically credible there is a controlling objection to the manner in which it comes into the case. The connection of the English sailor with the decedent rests upon an alleged conversation of the latter with one Lodge, in which Captain Bryant is said to have declared that he was born in the district of Poplar, in London, and came to this country when a boy, as a sailor, with other particulars as to his brother and sisters, etc. This account which is at variance with all the acts and declarations of Captain Bryant at previous times, including his sworn affidavits in matters of the utmost business importance to him, rests upon the unsupported testimony of Lodge. Of itself the burden would be heavy enough to carry, but the testimony of Lodge is discredited by its own contradictions, by his interest in the present claim, by his declaration to William Bryant, decedent's stepson, and to Henry J. Scott, Esq., his counsel, that there were no heirs, by his own failure to make any mention of English heirs at the time when the register of wills was considering the subject of administration and Lodge himself was an applicant for letters, and finally

by his entire failure to mention Captain Bryant's alleged birth in London, in the advertisement through which he came into communication with these claimants. The whole claim bears strong marks of having been manufactured after Captain Bryant's death, when the buzzards began to gather over an estate which seemed about to pass to the commonwealth for want of real heirs. The claim itself and every item based upon it must be disallowed.

This reduces the case to what we regard as the only substantial contest in it, that between the Massachusetts claimants and the commonwealth. The claim of the latter of course is merely negative and based on the failure of the former to make satisfactory proof of their case.

The starting point as already said must be the articles found in decedent's possession and the affidavits by him produced from the custom house records. Among these the certificate of citizenship is of controlling weight. It is the seaman's charter of safety and protection, which in case of wreck or trouble in any port of the world entitles him to call upon his country's consul for aid and assistance. No one having the slightest acquaintance with sailor character or sailor life needs to be told how scrupulously such paper is taken out, how carefully preserved. The affidavit of ownership of a vessel, for purposes of registration, is only second in importance to the certificate of citizenship. On it depend the "ship's papers" as they are commonly called, which are the vessel's charter of safety and protection as the certificate of citizenship is the individual sailor's. On the testimony of these papers we must start with the assumption that Captain Bryant the decedent was born in North Bridgewater, Mass., and that in May, 1856, he was about thirty-three years of age. The appellants have proved kinship with a Charles Bryant who was born in North Bridgewater July 25, 1822, followed the sea from his sixteenth year, and left his home in 1847 as mate of a coasting vessel. Further that although records were kept in North Bridgewater, no other Charles Bryant appppeared to have been born there within nine or ten years of this one. The correspondence in birthplace, age and occupation with the decedent as described in the certificate is certainly close enough to establish a fair prima facie case, and the date of his last leaving Bridgewater coincides

closely with the time when he practically became a citizen of Philadelphia. But in addition to this the personal description of the two men shows a general correspondence which could hardly be fortuitous. If this correspondence depended solely on the claimants' description of their relative it would be entitled to comparatively little weight, for besides the poverty of language to differentiate the peculiarities of feature and color which make up likeness, it behooves us always in cases of this class to remember that the idea of succession to the fortune of a hitherto unknown relative, exercises over even honest minds a fascination only to be compared to the gambler's desire to throw dice to get something for nothing, and hence it is the duty of courts and juries to scrutinize all such evidence with keen and incredulous eyes. But the appellants have fortified their case in this respect with a piece of evidence of great weight. One of them produced a daguerreotype which her kinsman gave her in 1844, and the opportunity is thus given for impartial comparison with the two photographs found in the decedent's trunk and admitted to be good likenesses of him. Such comparison leaves no doubt in the minds of any of this court, of the strong resemblance. This in itself might not be convincing, for likeness may be accidental, and the wonder rather is, considering the small area of the human countenance that among the countless thousands of faces such constant variation rather than likeness should be found. But that such resemblance should exist between portraits of two different men, of the same name, the same age, born in the same place, and following the same occupation passes the bounds of credible accident.

The auditing judge speaks of the decedent as having, or being "almost universally accredited" with having black eyes. If this were so it would be a serious difficulty in the way of treating the certificate of citizenship which describes a man with grey eyes as the rightful description of the man in whose possession it was found. But the learned judge inadvertently fell into error. We do not find any such testimony, and counsel for appellees though explicitly challenged to show it, failed to do so. Witnesses do say that Captain Bryant had black hair, which is a much less important matter. Hair which may be described by one witness as brown may appear black to another,

and it is conceded that Captain Bryant dyed his hair black during the latter years of his life when the recollection of him by the witnesses would be freshest.

Against this claim is really only the single fact of the reported death of the Bridgewater Charles Bryant at about the time the decedent became a resident of Philadelphia. That a man reported to be Charles Bryant of Massachusetts did die in New Orleans at that time seems to be beyond doubt, and it is also clear that he was assumed to be from Bridgewater, his chest was sent there and the family of the claimants accepted the announcement of death as that of their kinsman. But beyond this there does not appear any identification of the man himself. Was he a Charles Bryant from elsewhere in Massachusetts and not from North Bridgewater? Or was he really the Bridgewater Bryant, and did the decedent assume his name after his death? Or was he not Charles Bryant at all but erroneously so reported and did the decedent ignorantly or knowingly permit the error to go without correction? The second supposition that decedent assumed the name of the Bridgewater Bryant after the latter had died, is negatived by the miniature of 1844 and its undeniable resemblance to the decedent. The last supposition that the Bridgewater Bryant finding himself reported as dead allowed the report to go uncontradicted would most nearly reconcile the known facts. The decedent did keep himself apart from his relatives for the last forty or more years of his life, whether from a sailor's acquired indifference to home ties, or for other reasons he did not tell, and the truth is now never to be known. Any of these conjectures may be made plausible, but none of them is anything but conjecture. There is difficulty in the appellant's case, but we do not think on the whole that it can outweigh the affirmative evidence in favor of the identity of decedent with the North Bridgewater Charles Bryant.

The decree is reversed, the claim of George Lodge is disallowed and the fund directed to be distributed to the appellants George E. Bryant et al. Costs to be paid by appellees.