**McKinley BROWN, Petitioner-Appellant,**

v.

**Herman C. DAVIS, Warden,
Respondent-Appellee.**

**No. 84–5339.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1984.

Decided Jan. 21, 1985.

McKinley Brown, pro se.

William Farmer, Federal Public Defender, Donald E. Dawson, Asst. Federal Public Defender (argued), Nashville, Tenn., for petitioner-appellant.

W.J. Michael Cody, Jr., Atty. Gen. of Tenn., Wayne E. Uhl, Andrew Hoyal (argued), Asst. Attys. Gen., Nashville, Tenn., for respondent-appellee.

Before MERRITT and KRUPANSKY, Circuit Judges, and ROSENN, Senior Circuit Judge.*

ROSENN, Senior Circuit Judge.

In this habeas corpus proceeding, the appellant challenges his conviction in the

---

* Honorable Max Rosenn, Senior United States Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

criminal court of Sullivan County, Tennessee, for aggravated rape. The sole issue raised on appeal is whether the prosecution presented evidence at trial constitutionally sufficient to permit a jury to find that the accused is guilty beyond a reasonable doubt. At the core of the issue is a troubling problem generated by discrepancies in the eyewitness identification of the attacker. After an unsuccessful appeal to the Tennessee Court of Criminal Appeals, and the denial of permission to appeal to the Tennessee Supreme Court, the petitioner, McKinley Brown, filed a pro se petition in the United States District Court for the Eastern District of Tennessee for a writ of habeas corpus. Acting on the report and recommendation of United States Magistrate Robert P. Murrian, the court denied the petition without an evidentiary hearing. Represented by counsel, Brown appealed. We affirm the judgment of the district court.

## I.

While lying on a couch in the lighted living room of her home watching a television movie at approximately 1:30 A.M. on February 16, 1981, the victim in this case, a 67 year old white woman, suddenly felt a draft. She turned in the direction of the window from which the draft emanated and saw a man standing in the doorway just behind the couch. Frightened, she ran outside to seek help from her next door neighbor. The intruder, however, followed her outdoors, caught up with her, knocked her to the ground, and, telling her that "she would like it," inserted his finger in her vagina. She managed to extricate herself from his grasp and fight back, but her assailant lifted her from the ground, threw her down near a tree, and then fell on top of her. Overcome, the victim lost consciousness.

Awakened by screams, Evelyn Logan, a next door neighbor, rushed outside to see a tall person run around the corner of the victim's house. Mrs. Logan found the victim lying unconscious on the ground. Police arrived on the scene around 1:40 A.M. They found a belt across the woman's upper legs and a prophylactic and eyeglasses on the ground nearby. The victim was removed to the Halston Valley Community Hospital where her personal physician, Dr. Malcolm Jones, examined her and found bruises on her face, scratches on various parts of her body, and extreme tenderness over the rib cage. She was sufficiently lucid to describe the attack, and also complained of severe chest pains. An examination disclosed an arrhythmia of the heart which necessitated the implantation of a pacemaker. Her actual condition at the time of the examination did not permit x-rays or a "rape test." Subsequently, x-rays were performed and they revealed fractures of five or six ribs. It is undisputed that under Tennessee law, the victim was raped.[1]

On February 17, 1981, the day after the attack, police detective Moore interviewed the victim at the hospital. Moore found her heavily sedated, not lucid, and too weak to look at photographs of suspects. Although she did not identify her assailant, detective Moore did manage to obtain from her a description of him. She described her assailant as a six foot tall, slimly built, black man, about 25 years old, with a one inch beard. She said, "The man looked like someone I may have seen before in the neighborhood. I may be able to recognize him if I saw him again."

Margaret Harrell testified that she knew the appellant for several months and saw him on February 16 at Kelly Releford's, an illicit drinking establishment next door to the victim's home. She described him as nervous and with two marks on his hand. When the appellant took the stand, he testified that one of the marks had been on his hand for years but that the other was a bad knife cut he sustained shortly before this incident.

---

1. In his brief to this court, the appellant argued that there was no evidence of sexual penetration as to constitute rape under Tennessee law. Counsel withdrew this contention at oral argument.

Moore again talked to the victim on March 3, 1981, when her health had improved. At this interview, she named the appellant, a six foot three inch, thirty-six year old, cleanshaven, black man, as her assailant. She informed the detective that she did not need to look at photographs or snapshots to identify him because she had seen him almost daily for several years. He had performed odd jobs for her around the yard and house. The victim stated unequivocally and testified positively at trial that McKinley Brown, the appellant, who lived about four blocks from her home, was the man who had assaulted her.

The defense called a number of witnesses, including McKinley Brown, in an effort to establish an alibi for the appellant at the time of the assault. He and his girlfriend testified that on the night of the attack they were at the American Legion Hall and then went home, played backgammon, and went to bed. The jury rejected the alibi evidence and returned a verdict of guilty of aggravated rape. On appeal, the appellant contends that he was denied due process because the State did not support his conviction by sufficient evidence to sustain the prosecution's burden of proof beyond a reasonable doubt.

### II.

Under *Jackson v. Virginia*, 443 U.S. 307, 322, 99 S.Ct. 2781, 2790, 61 L.Ed.2d 560 (1979), a challenge to a conviction in a state court on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim. The Court in *Jackson* held that in a challenge to a state criminal conviction, "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324, 99 S.Ct. at 2791–92 (footnote omitted).

Our review in this case is narrow because the sole issue before us is whether the State met its burden of proving that it was McKinley Brown who perpetrated the attack on the victim. The proof must be more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir.1977).

In asserting that the evidence against him was constitutionally insufficient, the appellant argues that the victim's identification testimony is unbelievable. Although the victim knew the appellant over a period of years and saw him daily, and clearly saw the intruder in her lighted living room on the night of the attack, she did not give his name to Detective Moore when he first interviewed her on February 17. She described a man eleven years younger than Brown and wearing a one inch beard. Apparently, sometime later, she informed the police that "my granddaughter thinks [Franklin Long] is the attacker." Not until March 3, 1981, after a $2,500 reward had been offered, did the victim by written statement positively identify McKinley Brown as the attacker. The victim's panties and dress, as well as the belt, prophylactic, and Brown's hair samples, were sent to the Federal Bureau of Investigation for examination, but neither the laboratory results nor any physical evidence connecting the appellant to the crime were produced at trial.

At the trial, the victim affirmed an earlier explanation of her differing identifications stating: "The reason I didn't tell the police officers the day I was assaulted [that Brown was the rapist] was I was afraid my two boys would kill him and they would be in trouble." However, such a fear also would apply to her identification of Long.

The State convicted the accused almost solely on the basis of the victim's testimony. It is true that the testimony of a single, uncorroborated prosecuting witness or other eyewitness is generally sufficient to support a conviction. *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979); *United States v. Smith*, 563 F.2d 1361, 1363 (9th Cir.1977), *cert. denied*, 434 U.S. 1021, 98

S.Ct. 747, 54 L.Ed.2d 769 (1978); *United States v. Terry*, 362 F.2d 914, 916 (6th Cir.1966), *cert. denied*, 385 U.S. 1029, 87 S.Ct. 758, 17 L.Ed.2d 676 (1967). The prosecution, however, must present "substantial evidence as to each element of the offense from which a jury could find the accused guilty beyond a reasonable doubt. Substantial evidence ... is evidence affording a substantial basis of fact from which the fact in issue can reasonably be inferred." *United States v. Orrico*, 599 F.2d 113, 117 (6th Cir.1979).

In the case at bar, the statements by the victim prior to March 3 never mentioned Brown, even though she had an opportunity clearly to see the intruder in the lighted living room of her home. He was well known to her. Of course, she was heavily sedated and may not have been perfectly lucid during her first interview with Detective Moore on February 17, but then there was the intervening convalescent period until March 3 when the only name that surfaced was that of Franklin Long.

Furthermore, judged by any standard, Brown was not a plausible candidate to commit this attack. He was very well known to his victim, worked for her daily, and he would have had to know when he entered her lighted living room without any disguise that she would easily identify him as her attacker. Even the victim found it difficult to believe that McKinley Brown committed the assault, for in response to a question from the prosecution as to why appellant would have attacked her, she said, "that's the part that puzzles me." The attack was not in character for, as the victim further testified, Brown, at the time he worked for her, "was always such a nice person .... He was always respectable, nice as could be." The jury basically had no evidence other than the victim's eyewitness identification to establish guilt. "There is always cause for concern when guilt or innocence turns solely on identification testimony and nothing else connects the defendant with the crime." N.R. Sobel, *The Eyewitness Identification*, ¶ 3.02 at 13 (Clark Boardman Co. 1972). However, the victim knew the accused well and had a full opportunity to see him in her lighted living room.

The jury heard the accused and his alibi witnesses testify and had the opportunity to weigh their credibility as well as the victim's. Linda Price McKinney, the appellant's paramour, testified that on the night of the attack she had attended the American Legion club with him and he then spent the night at her apartment. Previously, she signed a statement for the police stating that she was not certain whether she saw the defendant at all on the night of February 15 and 16. Tim Price, her brother, corroborated his sister, but he likewise told the police when he was first questioned that he was uncertain where Brown was on the night of the assault. At trial, Brown testified that he spent the morning at Kelly Releford's, where he had a few drinks and left around noon. However, in his previous statement to Officer Moffitt on March 10, 1981, he stated that he spent the entire day of February 15 at the Releford house and left between 5:00 and 6:00 P.M. He said he then played cards with friends until midnight. At trial, however, he acknowledged that he did not play cards with his friends on February 15 and that several months later he advised the police that he was wrong and retracted this statement. In his initial statement, he said he went to bed at midnight of the fifteenth, but at trial he testified he played backgammon at Tim Price's apartment until after 1:00 A.M. and then went to bed in Linda's apartment next door. He testified that while at the American Legion he drank some, this time only two or three beers. He "felt good," he said, but he was not drunk.

There is no more troubling area of proof than in eyewitness identification. Many years ago, Justice Mitchell of the Pennsylvania Supreme Court perceptively observed that there were few more difficult subjects with which the administration of justice has to deal than identification. He succinctly explained:

The carelessness or superficiality of observers, the rarity of powers of graphic descriptions, and the different force with which peculiarities of form or color or expression strike different persons, make recognition or identification one of the least reliable acts testified to even by actual witnesses who have seen the parties in question.

*In re Bryant's Estate*, 176 Pa. 309, 318, 35 A. 571, 577 (1896), *modified*, 180 Pa. 192, 36 A. 738 (1897). In this case, our difficulties are compounded because the State's identification of Brown is predicated almost solely on the testimony of the victim. There is little corroborating evidence and the record is bare of any physical or circumstantial evidence, except for Brown's presence next door at the Releford's where he had been drinking. There is also the evidence of the cut on his hand the day following the attack. There can be no denial, therefore, that the State's case for identification rests basically and almost exclusively on the testimony of the victim.

We are painfully aware of miscarriages of justice caused by wrongful identification. Those experienced in criminal trial work or familiar with the administration of justice understand that one of the great problems of proof is posed by eyewitness identification,[2] especially in cross-racial identification. In his analysis of the unreliability of eyewitness identification, Judge Bazelon, dissenting in *United States v. Butler*, 636 F.2d 727 (D.C.Cir.1980), *cert. denied*, 451 U.S. 1019, 101 S.Ct. 3010, 69 L.Ed.2d 392 (1981), observed that:

> [M]any experts have concluded that convictions based solely on 'one eyewitness' identification represent 'conceivably the greatest single threat to the achievement of our ideal that no innocent men shall be punished.'

*Id.* at 732. Our concern for the problems inherent in eyewitness identification, however, does not compel the conclusion that the identification in this case is insubstantial. It does, however, alert us to the perils that confront us and the need to scrutinize carefully the record.

Despite the victim's failure to name her attacker when Moore first interviewed her at the hospital, she gave him a substantially accurate description of Brown, notwithstanding her heavy sedation. Furthermore, she said that her assailant looked like someone she had seen before in the neighborhood. Her reference to a beard may have been inaccurate, but Brown had previously worn a beard and the traumatic experience and sedation conceivably could have caused a mental transference in time. Thus, the error in time may not have had any significance under the circumstances for the jury. Moore refrained from further interviewing the victim because she was on the critical list during her first week of hospital confinement. When he saw her on March 3, she positively identified the accused,[3] and then gave Moore a statement to that effect. She knew the defendant well. She saw him in her lighted living room. She heard him speak to her during the attack. Her identification at trial was unequivocal and straightforward. Her testimony may be weakened by her initial failure to name Brown, but there is no suggestion that her identification had been tainted by police procedures.

There is nothing in the victim's initial statement to the police or in her trial testimony that makes her identification of

---

**2.** In his study on eyewitness identification, Wall notes: "It is upon this issue that there is the greatest danger of a miscarriage of justice." P. Wall, *Eyewitness Identification in Criminal Cases* 187 (Charles C. Thomas 1965).

**3.** Although she had previously given the police the name of Franklin Long, she did not name him as her assailant. Her granddaughter had suggested the name to her and she passed it on to the police. At trial she testified:

Q. Do you remember what you told [the police] about Mr. Long?
A. That my granddaughter thought it was him because he had beaten up four or five different women.
Q. All right.
A. And I was wrestling with myself. Could I be wrong.
Q. Did you tell them though that he did it, Mr. Long.
A. Oh, no.

Brown impossible. The jury saw and heard the victim and her alleged assailant and they may have believed that the victim could not quickly bring herself to name Brown because he had always been nice and respectful to her and she knew that she had been under sedation and might be confused. Conceivably, she may have been puzzling over the circumstances and events of the attack but, with the passage of time and the improvement in her health, her mind gradually became clearer and she may have realized that she had been right all along—that it was Brown indeed who had attacked her.

Although it may seem foolhardy and irrational for an undisguised man who is well known by the victim to attack her in a lighted room, rapes are not committed by persons who are always logical and rational. A majority of rape victims are known to their attackers. *Annual Report of Pennsylvania Coalition Against Rape* 31 (1982–83); *see also* M. Amir, *Patterns in Forcible Rape* 243 (U. of Chicago Press 1971). Anyone in a state of mind that would allow him to attack an elderly woman might not necessarily be sufficiently rational to be concerned about the possibility of identification, especially if he had been drinking. These considerations also may have passed through the jurors' minds and rationally warranted their verdict.

■ As the Supreme Court observed in *Jackson,* the relevant question for the federal court in the habeas corpus proceeding is not whether it believes the evidence at the state trial established guilt beyond a reasonable doubt, but whether, after viewing the totality of the evidence in the light most favorable to the prosecution, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). This standard, explained the Court, "gives full play to the responsibility of the trier of fact fairly to resolve the conflict in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* As a court of review, we must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict. *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *see also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941).

■ Furthermore, under 28 U.S.C. § 2254, the factual findings of the state court are presumed to be correct, unless one of the conditions set forth in 28 U.S.C. § 2254(d)(1)–(8) is met. To overcome the presumption of correctness, the petitioner must establish by convincing evidence that the factual determination in the state court was erroneous. And the jury's resolution of questions of credibility and demeanor—and there were many in this case—is entitled to "special deference." *Patton v. Yount,* —— U.S. ——, ——, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).

■ We have carefully considered the victim's failure to promptly name Brown as her assailant and the discrepancies in her identification. Only when the record evidence cannot reasonably support a finding of guilt beyond a reasonable doubt can we hold that there has been a constitutional denial of due process. *Jackson v. Virginia,* 443 U.S. at 318, 99 S.Ct. at 2788. The defense had every opportunity to cross-examine and impeach the victim's credibility. The issue of credibility, the demeanor of the parties, and the weighing of the evidence were properly for the jury. We perceive no constitutional error.

Accordingly, the judgment is affirmed.