985 F.2d 560
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Michael Darnell HARRIS, Petitioner-Appellant,
v.
Gene BORGERT, Respondent-Appellee.
 No. 91-2216.
 United States Court of Appeals, Sixth Circuit.
 Jan. 27, 1993.
 
 Before NATHANIEL R. JONES and RYAN, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Michael Darnell Harris appeals from the district court's order denying his petition for writ of habeas corpus. On appeal, he argues that identifications of him by the victim were constitutionally infirm and were insufficient to support a conviction, and that his post-conviction motion for relief from judgment was denied due to alleged bias on the part of the trial judge. We reject Harris' contentions and affirm the decision of the district court.
 
 I. The Case
 
 2
 On the afternoon of December 4, 1982, sixty-eight-year-old Lenore Neidhardt was cleaning the glass on the storm door of the front door of her home in Jackson, Michigan. She observed a young man walking up and down the street in front of her house. A short time later, while Neidhardt was working in her bedroom, the young man she had seen outside entered her home without permission and stood within three feet of her. He stated several times that he was going to rape her and proceeded to strangle her until she passed out. When she regained consciousness, the police were called. She was subsequently transported to a hospital. In addition to strangulation wounds, she suffered a knife cut to the throat. Medical evidence indicated sexual penetration by her assailant. Three hundred dollars had been taken from her purse in her bedroom.
 
 
 3
 Harris was arrested for these crimes. A preliminary examination was held on December 14, 1982. At this examination, Harris appeared in a lineup with five other males of like race and dress. Neidhardt identified Harris in the following manner:
 
 
 4
 THE WITNESS: I think it's the third one from that side. [identifying Harris]
 
 
 5
 THE COURT: Would you stand, sir? Is this the gentleman you mean, mam?
 
 
 6
 THE WITNESS: Yes.
 
 
 7
 THE COURT: That is the man you believe was in your home?
 
 
 8
 THE WITNESS: I believe he's the one. Either him or that one, but this one I think looks more familiar.
 
 
 9
 Preliminary Examination Transcript at 22-23.
 
 
 10
 William Strickrodt, a neighbor who lived two houses away from Neidhardt, also observed the young man walking up and down the sidewalk on the afternoon in question. At the same preliminary examination lineup, he identified someone other than Harris.
 
 
 11
 At Harris' trial, which began on March 28, 1983, it was the prosecution's theory that Harris was the man who attacked, raped and robbed Neidhardt. Testimony was introduced that Harris was unemployed and lived in a shelter for the homeless which provided him with free lodging and meals. Shortly after the robbery, Harris was observed both by his own acquaintances and by store clerks to be in possession of a great deal of cash. He made two substantial cash purchases. Harris testified on his own behalf. He denied that he had committed the offense and gave an alternative explanation for his possession of the cash.
 
 
 12
 A great deal of the testimony focused upon the descriptions and identifications by various witnesses. Neidhardt made an in-court identification of Harris as the assailant. She also testified to her previous identifications at the preliminary examination lineup and from a photographic array. The identification from the photographic array took place one hour after she arrived at the hospital on December 4, 1982. On cross-examination, defense counsel tried to undermine Neidhardt's identifications of Harris.
 
 
 13
 Mr. Strickrodt testified that, although he observed a man walking up and down the sidewalk on the day in question, he could not make a positive identification at trial. During cross-examination, defense counsel elicited testimony establishing that Strickrodt had identified someone other than Harris at the preliminary examination.
 
 
 14
 Witness Rose Wheaton, the manager of a store a few blocks away from Neidhardt's home, testified that she had previously identified Harris from a photographic array as having been a customer at her store on the afternoon in question. She was unsure, however, whether the man she saw on the day of the offense was in the courtroom. On cross-examination, defense counsel elicited testimony from her that her earlier identification from the photos was somewhat tentative.
 
 
 15
 Witness Amelia Evans, who was twelve years old, testified that she had been in the store where Wheaton worked. She identified Harris as a young man she had seen in the store shortly before the crime. She also testified that she had seen Harris walking by the victim's house a short time after she had seen him in the store. On cross-examination, defense counsel sought to elicit testimony that on the day of the incident, Evans had identified an individual other than Harris in a photographic array.
 
 
 16
 Jackson Police Officer Karl Ankrom testified concerning the photographic array he had constructed. Based on Neidhardt's description of her assailant, Ankrom assembled an array of six photographs of similar-looking males. He showed the array to Neidhardt, who picked out Harris' photo, saying that Harris' photo resembled the man who had attacked her, but that the photo was problematic because it was too dark. She also stated that a different picture of another individual had the complexion, coloring, and hair similar to the man who had attacked her, but that Harris' photo looked more like the assailant. Ankrom testified that he showed the array to Wheaton, who picked out Harris' photo, and to Evans, who mentioned only that the hairstyle of one of the individuals in the array matched that of the man she had seen on the afternoon in question. On cross-examination, defense counsel attempted to undermine the credibility of the identifications by eliciting testimony that when Neidhardt first looked at the photos, she was not wearing her glasses.
 
 
 17
 Jackson Police Officer Maurice Crawford testified to the identifications made at the preliminary examination. On cross-examination, defense counsel elicited the fact that Mr. Strickrodt had identified someone other than Harris.
 
 
 18
 On April 1, 1983, Harris was convicted by a Michigan jury of assault with intent to do great bodily harm less than murder, breaking and entering with intent to commit larceny, breaking and entering with intent to commit criminal sexual conduct, and first-degree criminal sexual conduct. On May 19, 1983, Harris was sentenced to prison terms of 6-10 years, 10-15 years, 10-15 years, and 60-90 years, respectively. Harris appealed as of right, and the Michigan Court of Appeals affirmed his conviction by summary order on May 1, 1985. The Michigan Supreme Court denied discretionary review by an order dated January 15, 1986.
 
 
 19
 On December 19, 1990, Harris filed his third and current petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254 (1988), in the United States District Court for the Eastern District of Michigan.[1] He raised two issues: (1) that the eyewitness identifications were constitutionally infirm and did not constitute evidence sufficient to support a conviction; and (2) that his post-conviction motion for relief from judgment was denied due to alleged bias on the part of the trial court.
 
 
 20
 On September 24, 1991, the district court denied Harris' petition. Harris filed timely motions for reconsideration on October 3 and 4, 1991. He also sent a "letter of objection" on October 7, 1991. On October 21, 1991, the district court issued an "Order Denying Petitioner's Motion for Reconsideration." On October 29, 1991, Harris filed a notice of appeal of the September 24, 1991 order denying his petition.
 
 
 21
 On January 29, 1992, Respondent filed a motion to dismiss due to lack of jurisdiction over this appeal. This motion was denied in an order of this court filed October 15, 1992.
 
 II. The Eyewitness Identifications
 
 22
 Harris argues that Neidhardt's identifications of Harris were unreliable due to the fact that she wavered at times in picking him out and the fact that other witnesses failed to identify him as the young man in the vicinity of Neidhardt's house on the afternoon in question. Since these unreliable identifications were put before the jury, Harris claims to be entitled to a new trial. "The ultimate finding of whether [an] identification was sufficiently reliable so as not to offend appellant's rights under the due process clause is, of course, a question of law, subject to full review by this court." Smith v. Perini, 723 F.2d 478, 481 (6th Cir.1983), cert. denied, 466 U.S. 941 (1984). We find Harris' arguments on this score to be without merit.
 
 
 23
 Identification procedures implicate the Due Process Clause of the Fourteenth Amendment. See generally Neil v. Biggers, 409 U.S. 188, 193-201 (1972). To determine whether certain identification procedures have violated a defendant's due process rights, we first look to whether the procedures were "impermissibly suggestive." If they were, we then look to the "totality of the circumstances" to determine whether the suggestiveness has led to a "substantial likelihood of irreparable misidentification." See id. at 198-201; Reese v. Fulcomer, 946 F.2d 247, 258-59 (3d Cir.1991), cert. denied, 112 S.Ct. 1679 (1992); United States v. Causey, 834 F.2d 1277, 1284-87 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988). In evaluating the reliability of an identification, courts are called upon to consider:
 
 
 24
 the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
 
 
 25
 Neil, 409 U.S. at 199-200.
 
 
 26
 In the instant case, Harris does not point out what exactly was impermissibly suggestive in either the photographic array or the preliminary examination lineup. Based on our own review of the record, we find nothing impermissibly suggestive. Thus, Harris does not even get to first base on his due process claim.
 
 
 27
 Even if we assume, arguendo, that the procedures were impermissibly suggestive, there are sufficient indicia of reliability such that there is no substantial likelihood of irreparable misidentification, as discussed in detail in the district court's opinion. In short, Harris has no valid due process claim.
 
 
 28
 To the extent that Harris' assertion of error with regard to the eyewitness identifications goes to the sufficiency of the evidence, his assertion is equally without merit. To assess Harris' argument that the evidence was insufficient to support a conviction, we must look not just to the eyewitness identifications, but beyond. The test is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "As a court of review, we must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict." Brown v. Davis, 752 F.2d 1142, 1147 (6th Cir.1985). Given this standard of review, and upon careful review of the record, we conclude that the evidence was sufficient to support a conviction.
 
 III. The Alleged Bias
 
 29
 Harris' final assertion of error is that the trial judge deprived him of due process by denying his post-conviction motion for relief from judgment due to alleged bias. The bases for the motion for relief from judgment were the infirmity and inadequacy of the identifications. The bias, he claims, is reflected in two post-sentencing letters sent from the trial judge to the Michigan Parole Board which recommended against parole for Harris.[2]
 
 
 30
 We find no error warranting the relief sought, for the reasons set forth in the district court's opinion.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 The first two petitions were dismissed for lack of exhaustion of state remedies. Harris v. Jabe, 86-CV-60095 (E.D.Mich. July 24, 1986); Harris v. Jabe, 88-CV-73782 (E.D.Mich. Aug. 31, 1989). See J.A. at 49
 
 
 [2]
 Under Michigan law, a prisoner serving a parolable life sentence or a long indeterminate sentence is subject to the jurisdiction of the Michigan Parole Board after serving ten years of imprisonment. The sentencing judge must be contacted to determine if he or she objects to parole, and is required to file written objections if he or she objects. Mich.Comp.Laws § 791.234(4)(b) (1992)