Jerry Bates LONG, Petitioner,

v.

Michael DUTTON, Warden, Respondent.

Civ. A. No. 3:85–0137.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 12, 1985.

Memoranda Opinions, Findings and Order
on the Merits July 12, 1985.

Joe P. Binkley and Patricia Young, Nashville, Tenn., for petitioner.

Kymberly Lynn Ann Hattaway, Asst. Atty. Gen., Nashville, Tenn., for respondent.

## MEMORANDUM OPINION, ORDER, AND DIRECTIONS

NEESE, Senior District Judge, Sitting by Designation and Assignment.

The petitioner Mr. Jerry Bates Long applied to this Court for the federal writ of habeas corpus, claiming that he is in the custody of the respondent-warden pursuant to the judgment of March 18, 1983 of the Circuit Court of Humphreys County, Tennessee,[1] in violation of the Constitution, Fifth Amendment, Due Process Clause;[2] Fourteenth Amendment; § 1, Due Process Clause;[3] and his right to a fair trial mandated by the former, *United States v. Shoupe*, 548 F.2d 636, 643 [7] (6th Cir. 1977), *reh. den.* (1977); *United States v. Blasco*, 702 F.2d 1315, 1329 [29] (11th Cir. 1983). 28 U.S.C. § 2254(a). The applicant claims he exhausted his state-remedies by presenting on direct review a part of the same questions he presents here to the Court of Criminal Appeals of Tennessee, which affirmed such judgment of convictions (but not as to punishment) on June 22, 1984 in *State of Tennessee*, appellee, v. *Jerry Bates Long*, appellant, no. 73–120–III, *permis. app. den.* (with concurrence in the result below only), October 1, 1984 by the S.Ct. of Tenn. 28 U.S.C. § 2254(b).

1. Such Court sat after a change of venue in Ashland City, Cheatham County, Tennessee.

2. "No person shall * * * be deprived of * * * liberty * * * without due process of law * * *." Constitution, Fifth Amendment, *supra*.

3. " * * * No State shall * * * enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of * * * liberty * * * without due process of law * * *." Constitution, Fourteenth Amendment, § 1, *supra*.

Among the applicant's claims of deprivation of federal due process of law are his allegations (in a section of his petition designated therein as 10.D.) because of the insufficiency of the evidence of his having been armed in connection with his conviction of armed robbery,[4] and allegations (in such a section designated therein as 10.E.) because of the insufficiency of the evidence of his having been a person who committed the respective crimes in connection with his convictions of aggravated rape, of burglary in the first-degree, and of grand larceny. He asserts that his afore-designated claims 10.D. and 10.E. were not presented on his direct appeal to the appellate courts of Tennessee " * * * as same were not included in [his] motion for a new trial, which was heard and disposed of prior to the entry of present counsel. Said facts were referenced by [present] counsel during the appeal of this case to the State appellate courts, and it was noted as correct by the opinion of the Court of Criminal Appeals * * * ."

The latter-named Court noted *inter alia* " * * * that sufficient evidence was presented to the jury to justify a rational trier of fact in finding the appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. Rule 13(e), T.R.A.P.; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979), [*reh. den.*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979)]. * * * " *Ib.*, at pg. 2. The intermediate criminal Court of Tennessee, having entertained the foregoing federal claims of the applicant on their respective merits, this Court " * * * must also determine the merits of the applicant's claim[s] * * * " on his application to this Court for relief via habeas corpus. *Lefkowitz v. Newsome*, 420 U.S. 283, 292, n. 9, 95 S.Ct. 886, 891, n. 9, 43 L.Ed.2d 196 (1975), cited in *Francis v. Henderson*, 425 U.S. 536, 542, n. 5, 96 S.Ct. 1708, 1711, n. 5, 48 L.Ed.2d 149 (1976).

Such a determination of sufficiency, of course, must be made from the whole record. *Cf. Holnagel v. Kropp*, 426 F.2d 777, 779 [4] (6th Cir.1970) (where a determination was necessary of whether a state-prisoner had had ineffective counsel). The respondent-warden will file an answer or other pleading within 23 days herefrom. Rule 4, 28 U.S.C. fol. § 2254. The clerk will serve forthwith by certified mail copies of the petition herein and of this order and direction upon the respondent-warden and the attorney-general and reporter of Tennessee. *Id.*

Within that same period, the applicant, if able, hereby is directed to produce the record of his trial before the aforementioned Court; otherwise,[5] it shall be produced by the attorney-general and reporter of Tennessee. 28 U.S.C. § 2254(e). The noticed slow movement of the mail provides good cause for the additional time allowed. 28 U.S.C. § 2243; Rule 81(a)(2), F.R.Civ.P.

## MEMORANDA OPINIONS, FINDINGS, AND ORDER ON THE MERITS

The respondents conceded that the petitioner exhausted his available state-remedies as to the questions presented herein. 28 U.S.C. § 2254(b).

### I.

■ The petitioner claims the constitutional-insufficiency of the evidence at his trial on such charges to support any of the convictions of crime for which he is held in custody by the respondent-warden. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " * * * [I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact

---

4. The Court of Criminal Appeals of Tennessee found: "No evidence showed the appellant [applicant, here] himself was in possession of a firearm at the time of breaking and entering.

*See* T.C.A. § 39–3 401(c)." *Ib.*, op., fn. 6, at page 11.

5. Counsel herein will confer regarding such production.

could have found proof of guilt beyond a reasonable doubt. [Footnote reference omitted.] * * * " *Ibid.*, 443 U.S. at 324, 99 S.Ct. at 2791–2792 [10].

" * * * [N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. * * * " *Ibid.*, 443 U.S. at 316, 99 S.Ct. at 2787 [6]. That, of course, assumes a properly-instructed jury. *Ibid.*, 443 U.S. at 317, 99 S.Ct. at 2788.

"A federal court has a duty to assess the historical facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. * * *

" * * * [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' * * * Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* [as in orig.] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. * * * The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law. * * * " (Footnote references omitted.) *Ibid.*, 443 U.S. at 318–319, 99 S.Ct. at 2788–2799[7].

Mr. Long was convicted of the crimes of (1) aggravated-rape, (2) burglary in the first-degree, (3) armed-robbery and (4) grand-larceny. The essential elements of those respective crimes are as follows:
1. The elements of rape in Tennessee " * * * are carnal knowledge, force, and commission of the act without the consent or against the will of the victim * * *," *State v. Wilkins*, 655 S.W.2d 914, 916[6] (Tenn.1983), *mod'f'd. on reh.* (as to costs only) (1983), and aggravated-rape is an aggravated form of the offense of rape, *id.*

2. Burglary in the first-degree in Tennessee is the breaking and entering into a dwelling or mansion house, by night, with intent to commit a felony. *State v. Bomar*, 352 S.W.2d 5, 6, 209 Tenn. 166 (1961), *reh. den.* (1961).

3. " * * * Robbery is the felonious and forcible taking from the person of another, goods or money of any value, by violence or putting the person in fear. * * * " T.C.A. § 39–2–501(a). Thus, in Tennessee, " * * * robbery is committed either by means of violence or by fear. In many robberies both violence (force) and fear are present, but only one of these elements is necessary, either being sufficient to constitute the crime." *James v. State*, 385 S.W.2d 86, 88, 215 Tenn. 221 (1964), *reh. den.* (1964), *cert. den.*, 381 U.S. 941, 85 S.Ct. 1777, 14 L.Ed.2d 705 (1965). Since the aforecited statute was amended so as to increase the punishment "if the robbery be accomplished by the use of a deadly weapon," as a procedural matter, " * * * simple robbery and armed robbery under the same statute [are treated] as being different degrees of the same crime. * * * " *State v. Winsett*, 399 S.W.2d 741, 743[3], 217 Tenn. 564 (1965).

4. " * * * [T]he essential elements of larceny are trespass and feloniously taking and carrying away. There must be a trespass, a taking and an asportation. * * * " *Wright v. State*, 549 S.W.2d 682, 684[3] (Tenn.1977).

The historical facts herein make plain that Mr. Wesley Bryant Martin was a person who burglarized the dwelling of Mr. and Mrs. Curte Stitt, robbed them, was an accessory to the rape of her by another, and during such trespass took and carried away their property, in Waverly, Tennessee between 11:30 o'clock, p.m., January 2, and approximately 1:00 o'clock, a.m., January 3, 1982. Other historical facts herein follow from the opinion of June 22, 1984 in *State of Tennessee*, appellee, v. *Jerry Bates Long*, appellant, no. 83–120–III in the

Court of Criminal Appeals of Tennessee, *permis. app. den.* by S.Ct. of Tenn. (1984, with concurrence only in the result):

> \* \* \* Curte and Margaret Stitt, then age 69 and 61, respectively, were awakened at 11:30 p.m. on January 2 by two masked men. One of the men, later identified as Wesley Bryant Martin, displayed a pistol and ordered Mr. Stitt to give him all his money. He later ordered Curte to open a floor safe located in another bedroom. When Mr. Stitt was unable to open the safe without his glasses, he was "hog-tied" to a bed with electrical cord and the safe was wheeled from the house [by those intruders].

> Meanwhile, in another room, Margaret Stitt had been tied to the posts of a bed with her husband's neckties while the second intruder assisted Martin in searching the home for money and valuables. The second man then returned to the "master bedroom," untied Mrs. Stitt, fondled her breasts, raped her vaginally, retied her to the bedposts in a spread-eagle, face-down position, and covered her head with pillows. As Martin and the second man left the Stitt home, they stole the couple's automobile.

> Excellent police work by the Weaverly Police Department resulted in the arrest of Martin in Nashville [, Tennessee] on January 4, 1982. Martin matched a description provided by Curte Stitt and items of property stolen from the Stitts were recovered in Martin's residence.

> A telephone conversation between Martin and the appellant [Mr. Long] was then recorded by the police with Martin's permission. As a result of the conversation, a search warrant was obtained for the appellant's [Mr. Long's] house. During the search, collectors' coins, similar to the $20,000.00 worth of coins stored in the Stitts' safe, were recovered. Additionally, two sledge hammers were seized from Long's garage. A powder present on the heads of the hammers was analyzed and found to contain the same substances used as insulation in the construction of [safes such as] the stolen safe.

> During the trial of Wesley Bryant Martin in October of 1982, the appellant [Mr. Long] testified for two and a half to three hours as a defense witness. After his testimony, Margaret Stitt identified Long by his voice as the second man involved in the criminal activities of January 2–3, 1982.

> \*   \*   \*   \*   \*   \*

*Ibid.,* op. at pp. 1–2.

Viewing that evidence in the light most favorable to the prosecution, there is no question that the crimes charged were committed, and that they were committed by Mr. Martin and another man. The state of Tennessee must have presented substantial evidence as to each element of the respective offenses from which the jury could have found Mr. Long was that "other man" and guilty as charged beyond a reasonable doubt; "\* \* \* '[s]ubstantial evidence ... is evidence affording substantial basis of fact from which the fact in issue can reasonably be inferred.' \* \* \*" *Brown v. Davis,* 752 F.2d 1142, 1145 (6th Cir.1985).

Even pretermitting the belated earwitness-identification of Mr. Long by Mrs. Stitt *arguendo,* substantial evidence was found that he was connected with the crimes: all the elements of the crime of receiving the property stolen from the Stitts were proven against him by the foregoing historical facts. *See Williams v. State,* 390 S.W.2d 234, 237, 216 Tenn. 89 (1965), *reh. den.* (1965), *cert. den.,* 382 U.S. 961, 86 S.Ct. 444, 15 L.Ed.2d 364 (1965), *reh. den.* 383 U.S. 963, 86 S.Ct. 1227, 16 L.Ed.2d 306 (1966), and *Tackett v. State,* 443 S.W.2d 450, 453[3] (Tenn.1969). Furthermore, there was substantial evidence that Mr. Martin confessed his complicity in the crimes, had some of the fruits thereof in his constructive possession, gave investigators thereof a full account of what had taken place in the dwelling of Mr. and Mrs. Stitts, and advised the police officers accurately that the remainder of the fruits of the crime were in the possession of "Jerry".

While none of the immediately foregoing placed Mr. Long at the scene of the crimes with Mr. Martin, the earwitness-testimony of Mrs. Stitt did provide substantial evidence of his presence and participation there. The identification of the voice of a person suspected of a crime as the voice of a suspected criminal is admissible evidence. *Stovall v. Denno*, 388 U.S. 293, 295, 87 S.Ct. 1967, 1969, 18 L.Ed.2d 1199 (1967) (where a suspect had been required pretrial by law-enforcement officials to repeat " * * * a few words for voice identification * * * " and, under the totality of the circumstances there, that suggestive procedure in the process of identification was found to have been justified).

The identification of a person as the committer of a crime solely on the basis of the identifier's opinion, that the voice of a suspect is the same voice as that of the person who committed the crime, is fraught with the possibility of misidentification, and this weakens its strength as proof of culpability. *Palmer v. Peyton*, 359 F.2d 199, 201 (4th Cir.1966) ("this is especially so when the identifier is presented with no alternative choices"). As soon as Mr. Martin was apprehended by the police and advised them of Mr. Long's connection with the crimes committed, Mr. Long was the only other person who became and remained a suspect as his accomplice; thus, this is not a situation wherein Mrs. Stitt chose between alternative voices she heard in confrontations after the commission of the crimes—it was Mr. Long or no other specific person so far as concerned Mrs. Stitt.

In determining the substantiality of Mrs. Stitt's testimony in this regard, this Court is guided by the same test as enunicated in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382 [13], 34 L.Ed.2d 401 (1972) (relating to eyewitness-identification) with consideration given to the lineup-factors set forth in *Moore v. Illinois*, 434 U.S. 220, 225, 226, n. 2, 98 S.Ct. 458, 463, n. 2, 54 L.Ed.2d 424 (1977), although Mr. Long was not subjected *per se* to an identification-process through a lineup.

*Opportunity and degree of attention*

Mrs. Stitt testified that the intruder of shorter stature in her home at the pertinent time, other than Mr. Martin, was believed by her, from the manner of his speech, to be a white man, and that this person made the following statements to her or within her hearing:

" 'Get-up, get-up, do you understand? do you understand?' "

"The shorter man said, 'Don't you dare touch the light switch.' "

"[The white man] asked me if I could 'open the safe.' * * * [H]e said, 'Do you mean that you have a safe in your home and you cannot open it?' "

(After they went to the middle bedroom), " * * * the white man * * * told me to 'shut-up and lay-down on the bed.' * * * "

(While fondling her breasts), " * * * he asked me * * * 'how old my husband and I' were * * *. [H]e said, 'do you still have sex?', and then he asked me if I had 'any diamond rings.' * * * "

"He did say I was 'still nice looking.' * * * "

(As to her diamond wedding-band), " * * * he said 'that's not what we're after.' * * * "

(When Mrs. Stitt offered her rapist the keys to and the "run" unhindered of her dress-shop as an alternative), " * * * he said 'that's not what we want.' * * * "

(After Mr. Martin had thrown her husband's ties on the bed and departed the room): " * * * He told me to 'turn-over on my stomach and put my hands behind my back' * * * and to 'spread my legs apart.' * * * [H]e told me to 'get on my back' * * *. He asked me to 'take off' my 'panties and pull' my 'gown up.' * * He got on me, and he kept saying 'Tell me it's good; tell me it's good; tell me it's good.' * * * "

(After the sexual-intercourse): " * * * He * * * told me to 'turn back on my stomach, put my hands behind my back,' and he would 'be listening for a car horn' and, when he heard it, that he would 'leave' and for me 'not to try to get loose

or * * * call the police before the next morning.' * * *"

Mrs. Stitt, when asked "how much" she had listened to her rapist's voice, testified: "I listened to every word he said." She testified she would never "forget what he said"; never "forget his voice"; had listened to what he said "acutely"; that she had no "trouble listening to his voice" and "heard him"; that she was listening carefully: "Because I was going to do exactly what he told me to do, because they threatened—if we didn't do exactly"; and that she had no "trouble hearing what that [white] man was saying" to her.

On cross-examination, she testified that, despite her assailant's wearing of a ski-mask the entire time of her contact with him, "I could understand what he was saying—." She said when she confronted him at the trial of Mr. Martin, she knew in advance that Jerry Bates Long was then charged as her assailant.

This Court hereby FINDS that the opportunity of Mrs. Stitt, at the time of the commission in early January, 1982 of the crimes against her and her husband to hear the voice of the shorter of their two assailants, was ample to have enabled her to recognize that voice anytime thereafter, in the context of "opportunity", and that her degree of attention thereto was almost complete. That she was unable to estimate the length of time that her rapist copulated with her and could not identify the facial features, etc. of her assailant after such close proximity does not preclude such a finding:

Justice Blackmun spoke to this latter consideration in the context of an eye-witness-identification where the victim of a crime, after having seen a photograph of her attacker in a large array, identified him tentatively as her rapist at a preliminary-hearing conducted 7 days after the commission of the crime, after she had been told by a police officer that she was going to view a suspect and should identify him if she could. That rape occurred at midday (as opposed to the nighttime rape here) within a period of only 10 to 15 seconds.

He observed *inter alia:*

> * * * 10 or 15 seconds of observation of the face of a rapist at midday by his female victim by no means is insufficient to leave an accurate and indelible impression on the victim. One need only to observe another person's face for 10 seconds by the clock to know this. To the resisting [or unwilling] woman, the 10 to 15 seconds would seem endless. No female victim of a rape, given that period of daylight observation, will ever believe otherwise * * *

*Moore v. Illinois, supra,* 343 U.S. at 234–235, 98 S.Ct. at 468.

Pretrial and trial confrontations

Mrs. Stitt, as a witness for the prosecution, confronted Mr. Long at his preliminary-hearing on April 1, 1982. She heard the petitioner speak threat; but, at the conclusion of the hearing, the hearing judge found judicially " * * * a situation where the victim [Mrs. Stitt] cannot identify the defendant [petitioner, here] Long * * *."

Notwithstanding Mrs. Stitt's inability to identify Mr. Long by his voice or otherwise as her rapist some 90 days after the rape occurred, on May 11, 1982 she and her husband sued Mr. Long as well as Mr. Martin for compensatory and punitive damages for her rape. It is patent that, to succeed against him therein, the plaintiff would be required to establish that it was Mr. Long who was her rapist.

Having committed themselves to this course of action by civil-litigation, it is inferable reasonably that there may have been a decisive and actual change in Mrs. Stitt's cognitive and recall mental processes psychologically, so that she became more subjective, partial and biased in the way she remembered the voice of the person who was responsible directly for the terrible mistreatment of her. *Cf. People v. Anderson,* 205 N.W.2d 461, (appendix, 494), 389 Mich. 155 (1973). This inference could have been drawn without suggestion

that the certainty of Mrs. Stitt, to the effect that Mr. Long "was the man" who raped her when she had been uncertain six weeks beforehand, represented a conscious and intentional readjustment of her memory; rather, the possibility existed of an *actual change* in her recall, *id.*

Additionally, there had been accounts in the newspapers in Waverly that Mr. Long had been convicted previously of armed-robbery; that charges of violation of the narcotics laws were then pending against him; and that, after the stealing of the Stitts' family-automobile, Mr. Long had disposed of a vehicle in a river near Nashville. All these factors could have been in Mrs. Stitt's mind when she appeared as a rebuttal witness for the prosecution in the trial of Mr. Martin in mid-October, 1982; thereat, after having heard him testify at length, she identified Mr. Long *positively* solely by his voice as her rapist.

Mrs. Stitt reiterated that positive identification in the trial of Mr. Long in the following March, 1983, as follows:

Q. "Miss Margaret, based on hearing that voice [of her rapist] that night [of the crime], do you remember that voice?"

A. "Yes; I'll never forget that voice."

Q. "Did you hear that same voice in the trial of Wesley Bryant Martin in October of 1982?"

A. "Yes, I did."

Q. "And, whose voice was that?"

A. "Jerry Bates Long's."

Q. "Any question in your mind about that?"

A. "No."

Q. "Is he the man who raped you?"

A. "He is the man; he is the man."

On cross-examination, Mrs. Stitt undertook to explain for the jury the reason she had just before made a positive identification of the voice of Mr. Long as that of her rapist when she had failed so to do at her first confrontation with him at his preliminary-hearing, as follows:

Q. "When you testified at the preliminary hearing [for Mr. Long], why is it you didn't identify him at the preliminary hearing?"

A. "I didn't hear him nearly as long at the preliminary hearing as I did at the trial [of Mr. Martin]; at the trial I did—I heard him longer at the trial."

\*   \*   \*   \*   \*   \*

Q. "You heard his voice in April, and you testified in April and said you couldn't identify it: there was nothing about him you could identify, is that correct?"

A. "Yes."

\*   .\*   \*   \*   \*   \*

This Court hereby FINDS that Mrs. Stitt did not identify Mr. Long in her initial confrontation with him at his preliminary-hearing some 60 days after having heard the voice (which she, herself, described as "unforgettable") of her assailant, but that she did identify him positively as her assailant at the trial of Mr. Long after having heard him speak at greater length at the earlier trial of Mr. Martin.

### The time-lag

Nine and one-half months elapsed in 1982 between the time (early January) of the commission of the crimes for which Mr. Long is now detained in custody and the time (mid-October) of Mrs. Stitt's first identification of his voice as the voice of her rapist. A lapse of time of that length is a " \* \* \* serious negative factor in most cases \* \* \*," *Neil v. Biggers, supra,* 409 U.S. at 201, 93 S.Ct. at 383 [14] (where a lapse of time of seven months between a rape and a confrontation between the victim and her alleged rapist included factors rendering "no substantial likelihood of misidentification" extant); this Court hereby FINDS the lapse of time here is such a serious negative factor.

The highest courts of Tennessee, considering the same historical facts as this Court now considers, determined that the evidence was sufficient under the federal Constitution to support the conviction of Mr. Long on all the charges for which he is in custody. 28 U.S.C. § 2254(d). The intermediate criminal appellate Court of Tennes-

see stated: "In this instance [sic] case, we conclude that there was, in addition to the voice identification, sufficient other circumstantial evidence presented which unerringly point[s] to Long as the white male intruder in the Stitt[s'] home. There was direct testimony that the white intruder raped Mrs. Stitts [Stitt]." *State of Tennessee*, appellee, v. *Jerry Bates Long*, appellant, *supra*, op. at p. 4.

" * * * A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. * * *" *Jackson v. Virginia, supra,* 443 U.S. at 223, 99 S.Ct. at 2791. " * * * To overcome the presumption of correctness [of the factual findings of the state Court], the petitioner must establish by convincing evidence that the factual determination in the state court was erroneous. And the jury's resolution of questions of credibility * * * is entitled to 'special deference.' *Patton v. Yount,* 467 U.S. 1025, ——, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984)." *Brown v. Davis, supra,* 752 F.2d at 1147 [3, 4].

As delineated with care, this Court has considered some of the conflicting inferences permissible reasonably anent the earwitness-testimony of Mrs. Stitt; however, " * * * a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. * * *" *Jackson v. Virginia, supra,* 443 U.S. at 326, 99 S.Ct. at 2793.

Conclusion as to the sufficiency issue

The evidence against Mr. Long was sufficient constitutionally to have supported reasonably a finding beyond a reasonable doubt by a rational trier of facts that Mr. Long was guilty as charged herein under the law of Tennessee.

## II.

■ Herein, further facts found historically are, as follows:

* * * During the direct examination of Assistant [Police] Chief W.E. Frazier, after identifying exhibit number 37, [the assistant district attorney] General Cook asked the witness to explain to the jury why these photographs, exhibits 34, 35, 36 and 37, were made. Chief Frazier explained that co-defendant Martin "was cooperating in the investigation and told them...." At this point defense counsel objected. In the presence of the jury, General Cook responded "... they were indicted as codefendants; they're accomplices to one another ... and as Your Honor pointed out it is an admission, a confession, and we're able to tie up and will tie up with that confession...." The objection was renewed and the jury sent out. A motion was made for a mistrial.

Following a jury-out hearing the trial court ruled "Defendant Long [the petitioner] had not had an opportunity to personally confront through counsel the declarant Wesley Bryant Martin, and I think it would be violative of *Bruton* to allow this statement into evidence." [3]

---

[3] In co-defendant Martin's earlier severed trial Long's attorney was correctly not permitted to confront Martin on behalf of Long.

Additional discussion took place and the trial court supplemented its ruling by remarking: "We can just back up prior to the admission of the gas station [exhibit] and start over again from that point. We simply will not refer to Exhibits 34 through 37 without leave of the Court."

The jury returned to the courtroom and was instructed as follows:

Members of the jury, you heard some reference to pictures of an abandoned gas station and an alleged statement made by Mr. Martin. The Court has ruled that the proper foundation has not been laid for that evidence, in other words *the wrong time to go into it;* and if they want to go into it they'll have to bring in some other evidence, so that will be excluded from your

consideration *at this time*. [Emphases by the present writer]. If you want to know what happened outside your presence, after the case is over if you'll come up and ask me I'll be glad to tell you.

We are not cited in either [party's] brief to a second hearing or a subsequent ruling by the trial court specifically dealing with a "confession" of the severed co-defendant. In Mr. Wallace's [defense-counsel's] cross-examination of Assistant Chief Frazier an exploration was made into why in less than twenty-four hours after the crime the officers did not attempt to take fingerprints from Martin's automobile or seek safe [a stolen item] residue from the vehicle's carpet or on his clothing. On redirect by [the district attorney] General Atkins, Chief Frazier answered that there had been no conversation about fingerprinting Martin's vehicle because he had told the officer "virtually everything that we wanted to know and what was involved." The Assistant [sic] District Attorney pressed on with the following:

Q. Had he told you who was involved in this burglary?

A. He had gave [sic] a first name.

Q. All right. Had he told you where you could find the rest of the property?

A. Not in a detailed description. He told us who had it. But not actually where it was.

Q. So based upon what he told you, you obtained a search warrant?

A. Yes.

Q. And you found the property like he said you would?

A. Yes.

MR. WALLACE: Your Honor, I object to that line of questioning. Mr. Atkins knows better than that.

THE COURT: I believe you opened the door for it. I'll allow it.

Q. (Atkins) So Wesley Bryant *Martin had told you* all this stuff about *who was involved* and where you could find the property. [Emphases supplied by this writer.]

A. Yes. He was cooperative.

Q. So there wasn't any use then in going back and searching his car because he had told you everything.

A. Yes, he had.

Q. And based upon what he told you, you went and searched Defendant Long's house?

A. Yes.

*State of Tennessee*, appellee, v. *Jerry Bates Long*, appellant, *supra*, op. at pp. 5–7, inclusive.

After having proclaimed in the presence of the jury that the petitioner and Mr. Martin stood "indicted as codefendants; they're accomplices to one another ... and as Your Honor [*the trial judge, himself*] *pointed out, it* [Mr. Martin's statement] *is* an admission, *a confession* " and that the prosecution "will tie up [the pertinent exhibit] with that confession," and after the trial judge had indicated to the jury that the only evidentiary difficulty with the testimony concerning Mr. Martin's confession was that it was "the wrong time to go into it, and if they want to go into it they'll have to bring in some other evidence," the prosecuting-attorney told the jury:

And they [the defense] got to the point where they were told "I didn't look at Martin's car because he had confessed and told me what happened and gave me the stolen property that he had and told me Jerry Bates Long had the rest of it."

\*      \*      \*      \*      \*      \*

There ain't no question about that. Wesley [Martin] told on Jerry. Wesley told on Jerry [Long].

*Ibid.*, op. at p. 8.

The petitioner objected to this argument, particularizing that Mr. Martin had not testified at this trial (and, consequently, was not subject to confrontation through cross-examination and otherwise) and that there was no evidence of the text of a confession by Mr. Martin. The trial judge responded with the somewhat startling instruction that, if the jurors recalled "a confession" in the evidence they would "consider it and that the presiding judge was of the opinion

that "the matter was in the record and was testified to," although it was for the jury to decide whether the opinion of the judge was wrong and if the jurors did not recall in the evidence "a confession," they would reject this testimony. *Id.*

In the light of the uncorrected statement of Mr. Frazier, the jury could have understood from this that the presiding judge would, not only not correct the prosecutor's remarks to the jury, but that it was his own opinion that Mr. Long's accomplice had "confessed," implying strongly that the remarks of the prosecuting attorney were correct. *Cf. Caldwell v. Mississippi,* — U.S. —, —, 105 S.Ct. 2633, 2645, 86 L.Ed.2d 231 (1985). Furthermore, this case was one in which the prosecuting attorney's remarks prejudiced a specific right of the petitioner: his right to confront witnesses against him, " * * * 'as to amount to a denial of that right.' * * * " *Cf. Ibid.,* — U.S. at —, 105 S.Ct. at 2645 (slip op. at p. 18).

Mr. Martin, having told the investigator "what had happened" and having named "Jerry" as his accomplice, it is clear that the prosecuting-attorney was contending that the jury should infer from those facts the further fact that Mr. Martin's confession proved that Mr. Long had participated in the crimes at the Stitts' home. *Cf. United States v. Wright,* 489 F.2d 1181, 1187[9] (D.C.Cir.1973). Mr. Frazier's testimony concerning his interview with Mr. Martin, therefore, was hearsay; and, because Mr. Martin was not available for cross-examination and to otherwise confront Mr. Long, " * * * Confrontation Clause concerns * * [were] * * * implicated. * * * " *Tennessee v. Street,* — U.S. at —, —, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985) (where "the trial judge twice informed the jury" that the confession of a separately-tried codefendant "was admitted 'not for the purpose of proving the truthfulness of his statement, but for the purpose of rebuttal only' ").

The petitioner claims these and other multiple instances of prosecutorial-miscon-

duct in addressing, or speaking in the presence of, the jury, in the aggregate, deprived him of a fair trial, so that he is detained by the respondent-warden pursuant to a final judgment of a state Court in violation of his federal right to due process of law, Constitution, Fifth and Fourteenth Amendments, Due Process Clauses. The trial Court found that the conduct of the prosecuting attorneys herein was " 'intemperate but I don't think it was prejudicial error,' " *State of Tennessee,* appellee, v. *Jerry Bates Long,* appellant, *supra,* op. at p. 9; whereas, the intermediate appellate Court of Tennessee found that the jury was "improperly influenced by the prosecutorial misconduct of repeatedly injecting into the minds of the jurors, and judge, that Martin had told all—confessed," *ibid.,* op. at p. 7, but confined its prejudicial effect to the sentencing-proceedings in Mr. Long's trial.

The federal-question for this Court is whether there was an absence in Mr. Long's trial of the observation of that fundamental fairness essential to the very concept of justice which " * * * fatally infected the trial, * * * " *Lisenba v. People of the State of California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290[19], 86 L.Ed. 166 (1941), cited and quoted-from in *Donnelly v. Christoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); " * * * the acts complained of must [have] be[en] of such quality as necessarily prevented a fair trial, * * * " *ibid.,* 314 U.S. at 236, 62 S.Ct. at 290[19].

" * * * On habeas corpus review, the standard to be applied to [an] allegation of prosecutorial misconduct is whether the petitioner was deprived of a fundamentally fair trial. * * * " *Stumbo v. Seabold,* 704 F.2d 910, 911[2] (6th Cir.1983). In applying that standard, this Court is to consider four factors: " * * * 'the degree to which the remarks complained of ha[d] a tendency to mislead the jury and to prejudice the accused; whether they were isolated or extensive; whether they were deliberately or accidently placed before the jury; and the strength of the competent proofs intro-

duced to establish the guilty of the accused.' * * *" *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir. *en banc* 1982), quoting *United States v. Leon,* 534 F.2d 667, 679 [14] (6th Cir.1976); *accord: Webster v. Rees,* 729 F.2d 1078, 1080 (6th Cir.1984); *Hearn v. Mintez,* 708 F.2d 1072, 1077 (6th Cir.1983). Each of these factors is to be considered in every case. *Id.*

### Tendency to mislead the jury and prejudice the accused

The jury was misled by such remarks to them and in their presence and could have understood that the trial judge in Mr. Long's trial had denominated what Mr. Frazier said Mr. Martin had said as the latter's confession; that in fact Mr. Martin had confessed; that all he had said in that confession was true; that Mr. Long was the accomplice of Mr. Martin who had admitted he committed the crimes charged; that, in connection with his confession, Mr. Martin had stated truthfully that "Jerry" was involved in the burglary of the Stitts' dwelling with him; and that the remainder of the loot taken therefrom by him and another was in the possession of Mr. Long. As found historically, *supra,* this prejudiced Mr. Long in his trial.

### Extensiveness of the remarks at issue

Other historical findings herein are: "In addition to the remarks about the 'confession' we have given consideration to each of the forty-five other allegations of prosecutorial misconduct during the State's [attorneys'] closing arguments. The Attorney General [of Tennessee] correctly points out that contemporaneous objection is missing in all but approximately twelve instances, therefore, *thirty-four* are subject to the rule of waiver [under the procedural law of Tennessee]. *Anglin v. State,* 553 S.W.2d 616, 622 (1977). * * * Many of the comments to which appellant [petitioner] directs us are, while error, isolated statements and misstatements made during a hotly contested trial. * * *" *State of Tennessee,* appellee, v. *Jerry Bates Long,* appellant, *supra,* op. at p. 9.

This Court FINDS that the prejudicial remarks of the prosecuting attorneys herein were extensive.

### The deliberateness in the placing of the remarks before the jury

The historical facts found, *supra,* concerning "the prosecutorial misconduct of repeatedly injecting into the minds of the jurors, and judge, that Martin had told all—confessed", and the extensiveness of those and other remarks which were similarly improper and prejudicial, prompts this Court to FIND that they were placed deliberately before the jury, as opposed to having been rendered as the result of accidental misspeaking.

### The strength of the competent proofs introduced to establish the guilt of Mr. Long

As delineated in great detail in part I of this opinion, the only substantial evidence, properly admitted against Mr. Long at his trial, was the earwitness-testimony of Mrs. Stitt and the physical evidence taken constitutionally from his home. On her own, without prompting from law-enforcement authorities, Mrs. Stitt, after the crimes were committed, in her second confrontation with Mr. Long identified him as "the man" who was with Mr. Martin during the commission of the crimes charged in her home ¾-of-a-year after she was unable to identify him during her first confrontation with him.

Thus, Mrs. Stitt did not compare the voice of Mr. Long with the voice of anyone else. The late Circuit Judge Sobeloff said in this context:

* * * Where the identification is by voice alone, the absence of some comparison involves grave danger of prejudice to the suspect, for as one noted commentator has pointed out:

"[E]ven in ordinary circumstances we must be cautious and accept only with reserve what a witness pretends to have heard. All the more must it be so if there are special difficulties in the way— if, for example, the voice comes from a great distance, if it is shrill, muffled, or presents any other peculiarity. The

same is true if the person whose voice has been heard is of a different nationality from the listener, if he speaks another dialect, or is better or less educated." Criminal Investigation, Jackson ed. (5th ed. 1962), at 41–42.

\* \* \* \* \* \*

*Palmer v. Peyton, supra,* 359 F.2d at 201–202 (where there was no lineup arranged for voice-comparison by the prosecuting witness in a rape).

Historically herein also, the "other man" who committed the crimes against Mr. and Mrs. Stitt wore a ski-mask throughout his tenure there; it is patent that Mr. Long wore no ski-mask while testifying in Mr. Martin's trial when Mrs. Stitt changed her original opinion concerning his identification by voice. It is inferred reasonably (in the absence of proof) that Mr. Long's voice would not have sounded exactly the same as it did to Mrs. Stitt at the Martin trial had he been wearing then a ski-mask.

Earwitness-identification, the same as eyewitness-identification, presents a substantial likelihood of irreparable misidentification: "Usually [as was true here] the witness must testify about an encounter with a total stranger under circumstances of emergency or stress. The witness' recollection of the stranger can be distorted easily by the circumstances \* \* \* [just as it may be distorted by] later actions of the police. \* \* \* " *Manson v. Brathwaite,* 432 U.S. 98, 112, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 849 (1977).

This is a troubling area of proof; there are " \* \* \* few more difficult subjects with which the administration of justice has to deal than identification. \* \* \* 'The carelessness or superficiality of observers, the rarity of powers of graphic descriptions, and the different force with which peculiarities of form or color or expression strike different persons, make recognition or identification one of the least reliable acts testified to even by actual witnesses who have seen the parties in question.' \* \* \*.

"We are painfully aware of miscarriages of justice caused by wrongful identification. Those experienced in criminal trial work or familiar with the administration of justice understand that one of the great problems of proof is posed by eyewitness [and earwitness] identification [2] \* \* \*. In his analysis of the unreliability of eyewitness identification, Judge Brazelon, dissenting in *United States v. Butler,* 636 F.2d 727 (D.C.Cir.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3010, 69 L.Ed.2d 392 (1981), observed that:

---

"[2] In his study on eyewitness identification, Wall notes 'It is upon this issue that there is the greatest danger of a miscarriage of justice.' P.Wall, *Eyewitness Identification in Criminal Cases,* 187 (Charles C. Thomas 1965).

" '[M]any experts have concluded that convictions based solely on "one eyewitness" identification represent "conceivably the greatest single threat to the achievement of our ideal that no innocent men shall be punished.'

*Id.* at 732. \* \* \* " *Brown v. Davis, supra,* 752 F.2d at 1145–1146. This is equally true, if not more so, of earwitness-identification.

Under the charges in the indictments against Mr. Long herein, the physical evidence discovered in his constructive possession assumed relevance to those charges only after Mrs. Stitt's earwitness-identification of him placed him in her home at the pertinent time. Absent her revised opinion, the only crime of Mr. Long having substantial support in the evidence would have been his receipt and concealment of stolen property—a crime with which he was not charged herein.

From all which, this Court must, and does, FIND that the competent proofs introduced to establish the guilt of Mr. Long were not strong—certainly the proof of his guilt was not overwhelming. " \* \* \* The Sixth Circuit [federal Court of Appeals] has stated, specifically with regard to prosecutorial misconduct in closing argument, that error may be harmless only if the proof against the defendant is 'overwhelming.' See, *United States v. Bowen,* 500 F.2d 41, 42 (6th Cir. [1974], cert. denied 419 U.S. 1003 [, 95 S.Ct. 322, 42 L.Ed.2d 278] (1974); *Berryman v. Colbert,* 538 F.2d 1247 (6th

Cir.1976), U.S. appeal pending.\* \* \* \* "
*Whiteside v. Bordenkircher,* 435 F.Supp.
68, 71–72[6] (D.C.Ky.1977).

It is the resulting conclusion of this
Court that the prosecutorial-misconduct
herein rendered Mr. Long's trial fundamen-
tally unfair. Accordingly, the writ of habe-
as corpus will issue, directing the respon-
dent-warden or his successor(s) to release
the petitioner Mr. Jerry Bates Long forth-
with from custody under his convictions of
March 18, 1983 in the Circuit Court of
Humphreys County, Tennessee unless the
state of Tennessee has begun a retrial
within 90 days herefrom. *Peyton v. Rowe,*
391 U.S. 54, 66–67, 88 S.Ct. 1549, 1556[8],
20 L.Ed.2d 426 (1968); *Irvin v. Dowd,* 366
U.S. 717, 728–729, 81 S.Ct. 1639, 1646 [13,
14], 6 L.Ed.2d 751 (1961).

---

\* Nor further action appears to have been taken thereon.